Kilcommons Shanahan, LLC
1322 Route 31 North
Annandale, New Jersey 08801
(908) 713-1862
(908) 713-9717 (facsimile)
kevin@ksmcounsel.com
Kevin M. Kilcommons, Esq.
Attorneys for Plaintiffs.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATHFINDER MANAGEMENT, INC., and RADIANT TECHNOLOGIES, INC. | : : : : |
| Plaintiffs, | : Civil Action No.: : |
| v. | : : : |
| MAYNE PHARMA PTY, an Australian Corporation; MAYNE GROUP, LTD., an Australian Corporation, MAYNE PHARMA (USA), INC.; FAULDING CONSUMER HOLDINGS, INC., a Delaware Corporation; FAULDING HEALTHCARE PTY, LTD, a Delaware Corporation; FAULDING HEALTH-CARE INTERNATIONAL HOLDINGS, INC., a Delaware Corporation; FAULDING HEALTHCARE US HOLDINGS, INC., a Delaware Corporation; FAULDING HEALTHCARE (IP) HOLDINGS, INC., a Delaware Corporation; FAULDING CONSUMER, INC., a Florida Corporation; FAULDING PHARMACEUTICALS CO., a Delaware Corporation; ABC CORPORATIONS 1 THROUGH 10 (as fictitious entities); JOSEPH BAYER, individually; STUART HINCHEN, individually; ANDREW VIDLER, individually; | : : : : : : : : : : : : : : : : : : : : : : : **COMPLAINT** |

|  |  |
|---|---|
| FRANK SCANLAN, individually; | : |
| JOHN WINNING, individually; and | : |
| JOHN DOE DEFENDANTS 1 through | : |
| 10 (as fictitious persons), | : |
|  | : |
| Defendants. | : |
| _____ | : |

The plaintiffs by and through their counsel, Kilcommons Shanahan, LLC, by way of Complaint as against the Defendants, assert as follows:

### THE PARTIES

1.  Plaintiff, Pathfinder Management, Inc., is, and at all times herein mentioned was, a corporation in good standing organized under the laws of the State of Florida, having its principal place of business at 1845 Elm Hill Pike, Nashville, Tennessee, 37210.

2.  Plaintiff, Radiant Technologies, Inc., is, and at all times herein mentioned was, a corporation in good standing organized under the laws of the State of Nevada, having its principal place of business at 1845 Elm Hill Pike, Nashville, Tennessee, 37210.

3.  Defendant, Mayne Pharma PTY, is an Australian corporation, and the parent corporation of plaintiff, Mayne Pharma (USA), Inc., with offices located in Melbourne, Australia.

4.  Defendant, Mayne Group, LTD, is an Australian corporation, believed to have its offices located in Melbourne, Australia.

5.  Defendant, Mayne Pharma (USA), Inc., is a Delaware Corporation, having its principal place of business at 650 From Road, 2nd Floor, Paramus, New Jersey, 07652, and formerly known as Faulding Pharmaceutical, Co.

6.  Defendant, Faulding Consumer Holdings, Inc., is a Delaware corporation, which is

believed to be a holding company of either Mayne Pharma PTY or one of the other named defendants.

7. Defendant, Faulding Healthcare PTY, Ltd., is a Delaware corporation, which is believed to be a holding company of either Mayne Pharma PTY or one of the other named defendants.

8. Defendant, Faulding Healthcare International Holdings, Inc., is a Delaware corporation, which is believed to be a holding company of either Mayne Pharma PTY or one of the other named defendants.

9. Faulding Healthcare US Holdings, Inc., is a Delaware corporation, which is believed to be a holding company of either Mayne Pharma PTY or one of the other named defendants.

10. Defendant, Faulding Healthcare (IP) Holdings, Inc., is a Delaware corporation, which is believed to be a holding company of either Mayne Pharma PTY or one of the other named defendants.

11. Defendant, Faulding Consumer, Inc., is a Florida corporation, which is believed to be a holding company of either Mayne Pharma PTY or one of the other named defendants.

12. Defendant, Faulding Pharmaceuticals, Co., is a Delaware corporation, and now known as Mayne Pharma (USA), Inc., which is believed to have been a holding company of either Mayne Pharma PTY or one of the other named defendants.

13. Defendant, Joseph Bayer, a citizen of Australia, was the president of Mayne Pharma PTY and/or one or more of the corporations named herein.

14. Defendant, Stuart Hinchen, was the president of third-party defendant, Faulding Pharmaceuticals, Co.

12.     Defendant, Andrew Vidler, is a citizen of Australia, was the vice president of defendant, Faulding Consumer, Inc.

13.     Defendant, Frank Scanlan, a citizen of the United States, was the controller of third-party defendant, Faulding Consumer Holdings, Inc. and/or one or both the Acquired Companies.

14.     Defendant, John Winning, a citizen of Canada, was the head of sales for defendant, Faulding Consumer Holdings, Inc. and/or one or both the Acquired Companies.

## STATEMENT OF JURISDICTION

15.     The Court has jurisdiction over the subject matter in controversy pursuant to 28 *U.S.C.§ 1331*, as the controversy arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 *U.S.C. § 1960 et seq.*, and the Wire Fraud Act, 18 *U.S.C. §* 1343, as hereinafter more fully appears.

17.     Plaintiff, Pathfinder Management, Inc. is incorporated under the laws of the State of Nevada and plaintiff, Radiant Technologies, Inc. is incorporated under the laws of the State of Florida, have their principal place of business in the State of Tennessee. The defendants are incorporated under the laws of the States of Delaware, Florida and the country of Australia, with defendant Mayne Pharma (USA), Inc. having its principal place of business in Paramus, New Jersey. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. *§ 1332*.

18.     This Court has supplemental jurisdiction over the pendent state law claims pursuant to *28 U.S.C. §* 1367.

## PERSONAL JURISDICTION

19.     This Court has personal jurisdiction over all the Defendants because they have sufficient minimum contacts with the State of New Jersey to satisfy due process, including

without limitation the following: The Purchase Agreement concerning the sale of Faulding Consumer, Inc. and Faulding Healthcare (IP) Holdings, Inc. was entered in the State of New Jersey, subject to the laws of said jurisdiction, and further, performance thereof was entirely within New Jersey, pursuant to Section 10.7 (page 31), therein. Therefore, the defendants have availed themselves of the laws of the State of New Jersey and are subject to its jurisdiction.

## STATEMENT OF VENUE

20.     Venue is appropriate in this District pursuant to 28 *U.S.C. §* 1391, because the events presented in this action occurred within the State of New Jersey.

## FACTUAL BACKGROUND

21.     Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through twenty (20) of the Complaint as set forth at length herein.

22.     Plaintiff, Pathfinder Management, Inc. is, and at all times herein mentioned was, a corporation in good standing organized under the laws of the State of Nevada.

23.     On or about March 28, 2003, Pathfinder and defendant, Mayne Pharma (USA), Inc. (hereinafter "Mayne Pharma (USA)") closed a purchase and sale transaction in which all of the outstanding shares of two subsidiaries, Faulding Consumer, Inc. and Faulding Healthcare (IP) Holdings, Inc. ("the Acquired Companies"), were purchased by Pathfinder.

24.     By the terms of the purchase agreement, January 1, 2003 was specified as the "Effective Date" of the agreement, although the transaction did not actually close until March 28, 2003, as it was the intent of the parties to separate all operational activities between them as of the Effective Date, except for the defined terms "Accounts Receivable" and "Inventory." Except for a specified list of accounts attached to the agreement, Pathfinder assumed no liabilities for operations or expenses incurred prior to January 1, 2003.

25.     During the due diligence phase of negotiations, the Pathfinder personnel conducted a site inspection of the Acquired Companies' offices in Fort Lauderdale.  During that site inspection,

the Faulding Consumer, Inc. ("FCI") vice president, Andrew Vidler, an employee of the Mayne Group, who was reportedly on assignment to FCI at the direction of Joseph Bayer, and National Sales Manager John Winning, made a Power Point presentation covering the nature of the sun care industry, the position within that industry of the Acquired Companies' business; and specifically, they reviewed the various accounts, sales histories, and sales projections for each major retail account. During this presentation, the issue of credits and returns was discussed, and the response to Pathfinder's inquiry concerning the returns issue was that all returns were in and that there were holdbacks in the hands of buyers that would account for any returns. Further during this presentation, Pathfinder was made aware of the projected sales of over $11,000,000.00 for the 2003 sales season, but was not made aware of any outstanding returns or credits issues against those sales. Pathfinder was informed of litigation with Albertson's, Inc., a food and drug retailer, but as no projections had been made with respect to sales to Albertson's for the 2003 season, this issue did not impact its analysis of projected sales. Pathfinder specifically inquired as to the anticipated returns of goods for the 2002 sales season, and was told by defendants that all return issues would be addressed by defendants prior to the sale of the businesses. Moreover, in connection with this discussion, Pathfinder was informed that customers generally paid only 70% or 80% of the invoice during the season and held back 20%-30%, and that these hold back amounts would address the returns for the 2002 sales season. These statements proved to be willfully false.

26.     In addition, the defendants made the following material misrepresentations: (a.) Sales in 2002 were in the amount of approximately $8,000,000.00 dollars, resulting in net sales for calendar year 2002 of $4,000,000.00 after deduction for returns and trade credits; (b.) the Sea & Ski® business constituted a 7% share of the sun care market; (c.) as of January 2003, all material returns had been accounted for among the major accounts; (d.) significant returns were seen because of some problems with the Asta-Zanthin sun screen formula and the resulting staining of clothes, but that this problem had already been resolved through reformulation and replacement of inventory in the warehouse; (e.) based on 2002 performance, strong 2003 sales were projected; (f.) the Sea & Ski® brand had a strong market acceptance and goodwill, stemming

from 70% name recognition in consumer surveys; (g.) the CVS Corporation was a major account, with good projected sales for 2003; (h.) the major customer in Canada, Shopper's Drug Mart, Inc., was non-return business, therefore sales made in Canada were not subject to return exposure; (i) an exclusive distributor in Canada, Associated National Brokerage, owed an outstanding balance from 2002 in excess of $265,000.00, and had no right to credit any product returned from its customers return product delivered prior to December 1, 2002. All such statements were wilful misrepresentations.

27.     Pathfinder personnel, accompanied by defendants, Hinchen, Winning, Vidler and the FCI warehouse manager, inspected warehouse facilities and inventory.  During which, Pathfinder was shown racks loaded with what was represented to be current, new formula class "A" inventory, together with a much smaller amount of what was termed class "B" inventory, which had shorter expiration dating, and an area of class "C-D" inventory, which was to be discarded or destroyed. The issue of the product incorporating the old Asta-Zanthin staining formula was discussed, and Pathfinder was specifically told by the defendants that the inventory shown did not represent any of the defective Asta-Zanthin product, which statements have since been proved false.

28.     After the parties had engaged in due diligence, the initial purchase price agreed upon by the parties was Three Million, Five Hundred Thousand Dollars ($3,500,000.00). However, shortly before the execution of the Agreement, the third-party defendants demanded an additional One Million, Six Hundred Thousand Dollars ($1,600,000.00) for "positive and negative receivables," which they asserted had not been included in their offer. In making its initial offer, Pathfinder understood that the proposed acquisition would not carry with it any pre-existing liabilities of the Acquired Companies, save and except for certain liability for an outstanding litigation matter involving FCI and Albertson's, Inc., for purchase orders for product, and for existing office and warehouse leases.

29.     On or about February 28, 2003, while reviewing the FCI's revised proposed schedule to

the draft agreement, Pathfinder learned of a disclosure of a significant credit in favor of Long's Drugs.  Prior to that time, Pathfinder was led to believe that the few credit items that had been discussed were referred to by FCI solely for the purposes of full disclosure, and that the ultimate selling entity would be retaining these liabilities.  In response to this disclosure, on or about March 4, 2003, a telephone discussion was held with Hinchen and general counsel, during which Pathfinder first learned that the Acquired Companies held an outstanding credit total of almost $1,000,000.00 in "negative receivables;" and further, that Pathfinder was expected to satisfy these credits against the "positive" accounts receivable from 2002 in approximately the same amount. Pathfinder stated that this demand would be acceptable provided the $1,000,000.00 in "positive" accounts receivable were in effect "new money" which fell outside of its due diligence investigation in preparing its offer to purchase, because the "positive" accounts receivable had previously been considered by Pathfinder in preparing and submitting the bid to purchase the business of the Acquired Companies. However, the defendants misrepresented that the "positive" accounts receivable did not represent "new money" and had been factored into the transaction from the standpoint of Mayne Pharma USA and the Mayne Group.

30.     Further discussion with Winning concerning the nature and extent of the accounts receivable list provided by defendants, resulted in representations that of these "positive" receivables, November and December sales were good sales from top ten retailers in the approximate amount of $725,000.00, the Canadian account and the two specified distributors were good for the money, but that it would take some time to collect on the approximately $380,000.00 in receivables, and that the rest of the accounts were small but likely good.  With

respect to the credits or "negative" receivables, Winning advised that approximately $500,000.00 were normal course of business credits from end of season returns, and that these credits were more than matched by the "Top 10" receivables even after returns. Winning's conclusion represented to Pathfinder was that the result of the receivables would be a net to the purchaser of approximately $1,000,000.00, with some slow pay, against $700,000.00 in credits and liabilities. Again, time would prove these statements to be false and clearly intended to induce Pathfinder's entrance into this transaction.

31.     Based on the representations of the defendants, Pathfinder renegotiated the sales price to include an additional $1,100,000.00 for the assumption of the "accounts receivable" with the understanding that this schedule represented the entirety of the additional credits and liabilities, which it would be assuming in the purchase of the Acquired Companies. Pathfinder and FCI entered into an agreement for the purchase and sale of the Acquired Companies as ongoing entities.  Although the transaction was agreed to be effective as of January 1, 2003, Mayne Group remained in control of the Acquired Companies' business until March 28, 2003.  The agreement bears a date of March 10, 2003, but was not executed until March 28, 2003, and the purchase funds in the sum of $4,600,000.00 were paid to Mayne Pharma USA via electronic wire transfer on or about April 2, 2003.

32.     Within months of the closing, and up to and including December 2005, Pathfinder experienced return products from many of the defendants' customers, which vastly exceeding the representations of Hinchen and Vidler. In fact to date, Pathfinder's return product liabilities have equaled or exceeded the purchase price paid by Pathfinder.

## Count One

### (Federal RICO)

33.     Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through twenty (32) of the Complaint as set forth at length herein.

34.     The defendants were aware that the information provided to Pathfinder during the due diligence period regarding return product was false and misleading, and said parties fabricated or falsified or concealed documents to hide the true nature and extent of the return product liabilities; all for the purpose of selling a product and the outstanding capital stock of two corporations, which the defendants knew to be worthless.

35.     Further, defendants continued to conceal these misrepresentations through their former officers, Winning and Scanlan, who were hired by Pathfinder and/or its subsidiary, Radiant Technologies, Inc.

36.     The third-party defendants conspired to make false representations, conceal or alter the financial documents of the Acquired Companies to induce the third-party plaintiffs to believe that the capital stock held substantial value when, in fact, the stock was worthless.

The third-party defendants constitute a criminal enterprise and have engaged in a pattern of racketeering activity through the sale of the worthless securities of Faulding Healthcare (IP) Holdings, Inc. and Faulding Consumer, Inc. and within the meaning of RICO, 18 *U.S.C. §* 1961 *et seq.,* by executing a conspiracy or enterprise to defraud the plaintiffs of millions of dollars in the purchase of the Acquired Companies through the use of theft, deception, misrepresentation, statutory, common law, and wire fraud.

37. Defendants engaged in a pattern of racketeering activity, within the meaning of RICO, 18 *U.S.C. §* 1961 *et seq.,* by executing an unlawful conspiracy to devalue the assets of plaintiffs, deprive plaintiffs of the benefit of their acquisition of the Acquired Companies through the use of theft, deception, misrepresentation, statutory, common law, and wire fraud.

38. Defendants conspired with each of the former employee defendants, Winning and Scanlan, both before they became employees of the plaintiffs and thereafter, to effectuate the unlawful enterprise or racketeering activity described in this Count of the Complaint.

39. Defendants' actions or conduct in furtherance of the racketeering activity or enterprise, include, but are not limited to, the following predicate acts:

   a. The representations of the 2002 sales figures were fraudulent because, after applicable returns, credits and allowances are taken against 2002 sales, and upon information and belief that actual net sales for the 2002 season were no more than $1,000,000, and may in fact have been less than zero.

   b. The representations of market share for the Sea & Ski® brand were fraudulent because, as a result of the true nature of the 2002 sales figures, the Sea & Ski® sun care brand did not have 7% market share; in fact, this brand had no real market share whatsoever, and the product was basically given away to motivate the retailers to place it on the shelves to build sales numbers.

   c. The concealment of true sales and accounting figures was fraudulent because returns and credits posted between January 1, 2003 and the date of closing of the transaction were in

excess of $3MM, and total in excess of $8MM for the 2002 season overall; these credits were known or should have been known to Mayne USA and Mayne Group prior to January 1, 2003, but were concealed and posted subsequent to January 1, 2003 to avoid reducing the sales figures shown to Pathfinder.

d. The representations that returns of product form retailers for the 2002 season were abnormally high because of the Asta-Zanthin staining issue were fraudulent because returns of product from retailers for the 2002 season were not motivated simply by the Asta-Zanthin staining issue; rather, returns and credits were extraordinary because of the lack of market acceptance of the product.

e. The representations that the Asta-Zanthin staining issue had been fully resolved were fraudulent because, although resolution of the Asta-Zanthin staining issue had been identified through the reformulation of the sun screen formula, this resolution had not been implemented, resulting in the bulk of inventory in the warehouse consisting of high Asta-Zanthin formula product; therefore, the product in the warehouse was for the most part not marketable to leading retailers, which proved contrary to defendants' representations during the due diligence inspection of the Florida facility.

f. The representations of strong 2003 projected sales were fraudulent because of the lack of real sales for the 2002 season and the high credits and credit balances on key accounts that were not disclosed to Pathfinder and well in excess of those balances specified in the accounts receivable schedule to the sales agreement.

g. Further, the representations of strong market acceptance and goodwill of the Sea & Ski®

   brand were fraudulent because in effect the brand had no market share and no goodwill in view of the lack of real sales for the 2002 season.

   h.  The defendants executed the goal of their fraudulent acts by inducing the plaintiff to wire $4,600,000.00 to defendant, Mayne Pharma (USA)'s bank account in violation of the Wire Fraud Act, *18 U.S.C. §1343*.

   i.  The defendants' acts violated the criminal statutes of the State of New Jersey: N.J.S.A. 2C:41-1, *et seq.* (to wit: theft and fraud in the offering, sale or purchase of securities), N.J.S.A. 2C:20-4 (to wit: theft by deception), and N.J.S.A. 2C:5-2 (to wit: conspiracy)

40. Defendants' actions or conduct in furtherance of the racketeering activity, including, but not limited to, the foregoing predicate acts, are prohibited by RICO, 18 *U.S.C. §* 1961-6.

41. Defendants' violations of RICO, *18 U S.C. § 1962, et seq.,* were the proximate cause of the damages to plaintiffs' business and property, including monetary loss; loss of business reputation and goodwill, loss of property and other valuable business materials, and causing irreparable harm. The injury and damages sustained by plaintiffs were the natural and foreseeable result of defendants' misconduct.

42. The injury and damages sustained by plaintiffs were the intended consequences of the defendants misconduct.

43. As a direct and proximate consequence of the defendants' conspiracy described herein, execution of the predicate acts to that conspiracy and effectuation of the conspiracy, plaintiffs have been injured and will continue to suffer injury and harm that is irreparable.

   WHEREFORE, Plaintiffs demand judgment as against the defendants, joint and severally,

for compensatory damages, lost profits and revenues, treble damages, together with costs of suit, attorneys fees, interest and any further relief, which the Court may deem just and equitable.

## Count Two

### (New Jersey RICO)

44. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through forty-three (43) of the Complaint as set forth at length herein.

45. The defendants' actions violated the New Jersey RICO statute, N.J.S.A. 2C:41-1, *et seq.* (to wit: theft and fraud in the offering, sale or purchase of securities), N.J.S.A. 2C:20-4 (to wit: theft by deception), and N.J.S.A. 2C:5-2 (to wit: conspiracy), and as a result, the third-party plaintiffs suffered damages and loss of profit, good will and business reputation.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for consequential, compensatory and treble damages, together with attorneys' fees, costs and interest, in addition to any further relief, which the Court may deem just and equitable.

## Count Three

### (Common Law Conspiracy)

46. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through forty-five (45) of the Complaint as set forth at length herein.

47. Defendants' acts constitute a civil conspiracy within the meaning of New Jersey's common law.

48. The purpose of third-party defendants' civil conspiracy, included, without limitation: to

acquire unlawfully the assets of another; to devalue the assets and business of another; to expose another to liability in damages for the conspirators' misconduct; and were improper actions under New Jersey law independent of the conspiracy.

49. Said conspiracy caused damages to third-party plaintiffs' businesses and property.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for consequential, compensatory and treble damages, together with attorneys' fees, costs and interest, in addition to any further relief, which the Court may deem just and equitable.

## Count Four

### (Fraudulent Misrepresentation)

50. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through forty-nine (49) of the Complaint as set forth at length herein.

51. The defendants intentionally misrepresented information to the third-party plaintiff, which information was disclosed during the due diligence period as well as prior to the execution of the Purchase Agreement.

52. The defendants fraudulently misrepresented themselves with the intent of third-party plaintiff relying upon their representations.

53. Plaintiffs reasonably relied upon the defendants' misrepresentation, and as a result, the said plaintiffs have been damaged.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for consequential, compensatory and treble damages, together with attorneys' fees, costs and interest, in addition to any further relief, which the Court may deem just and equitable.

### Count Five

### (Negligent Misrepresentation)

54. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through fifty-three (53) of the Complaint as set forth at length herein.

55. The misrepresentations and falsified documents and data submitted for review during the due diligence period and thereafter, were provided to reasonably foreseeable recipients, the plaintiffs.

56. The defendants had a duty to provide accurate information and complete and truthful records, documents and data in response to the third-party plaintiff's inquiry.

57. The plaintiffs justifiably relied upon the false information, records, documents and data conveyed by the third-party defendants.

58. The plaintiffs actually relied upon the false information in entering into the Purchase Agreement and as a result were damaged.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for compensatory damages, together with attorneys' fees, costs and interest, in addition to any further relief, which the Court may deem just and equitable.

### Count Six

### (Tortious Interference with Potential Economic Benefit)

59. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through fifty-three (58) of the Complaint as set forth at length herein.

60. At or about the time the defendants misrepresented that Associated National Brokerage (hereinafter "ANB") had no right to credit any product returned from its customer's non-return business, they had only recently entered into an agreement with ANB agreeing to just the opposite terms.

61. Specifically, Steve Stubbs, the president of ANB, was told that his debt to FCI would be forgiven, and his company would be allowed credit for its own customer returns.

62. The defendants' contrary statements to Pathfinder effectively put it and ANB on a collision course, which has led to litigation in Canada between these companies.

63. The plaintiffs intended to continue to pursue business with ANB after the acquisition.

64. The defendants maliciously interfered with the plaintiffs' potential economic benefit from ANB, which resulted in a loss of further business from ANB.

65. Had the defendants not interfered, there was a reasonable probability that the plaintiffs would have been able to continue doing business with ANB.

66. As a result of the defendants' interference, the plaintiffs were damaged.

WHEREFORE, plaintiffs demand judgment against the defendants, jointly and severally, for compensatory and consequential damages, together with attorney fees, costs and interest, in addition to any further relief, which the Court may deem just and equitable.

## Count Seven

### (Breaches of Contract)

67. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through sixty-six (66) of the Complaint as set forth at length herein.

68. The defendants breached their obligations under the Purchase Agreement by their intentional misrepresentations and falsification of the due diligence information and failure to make full and truthful disclosures of information requested by the third-party plaintiff.

69. The defendants further breached by failing to provide accounts receivable, notes receivable and other indebtedness due and owed by third parties as promised.

70. The defendants further breached by providing worthless outstanding capital stock for two companies: Faulding Healthcare (IP) Holdings, Inc. and Faulding Consumer, Inc.

71. The third-party defendants further breached by failing to provide requested documentation concerning the net worth of the company, and specifically, the "negative receivables" relative to return product from the defendant's retail customers.

72. The third-party defendants failed to pay all Federal and/or State income tax obligations for the year 2002 as required under the terms of the Agreement.

73. As a result of these breaches, the third-party plaintiffs were damaged.

WHEREFORE, plaintiffs demand judgment against the defendants for consequential and

compensatory damages, together with attorney fees, costs and interest, in addition to and any further relief, which the Court may deem just and equitable.

## Count Eight

### (Breach of Implied Duty of Good Faith and Fair Dealing)

74. Plaintiffs repeat and reallege the allegations set forth in paragraphs in one (1) through seventy-three (73) of the Complaint as set forth at length herein.

75. The defendants were obligated under an implied covenant of good faith and fair dealing pursuant to their contractual undertakings with the plaintiffs.

76. The third-party defendants breached the said covenant resulting in damages to the third-party plaintiffs.

WHEREFORE, plaintiffs demand judgment against the defendants for consequential and compensatory, together with attorney fees, costs and interest, in addition to and any further relief, which the Court may deem just and equitable.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

The undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

                                                  KILCOMMONS SHANAHAN, LLC
                                                  Attorneys for Plaintiffs


                                            S/     Kevin M. Kilcommons
                                                Kevin M. Kilcommons, Esq.


Date:  May 8, 2006