**NOT FOR PUBLICATION**



## U N I T E D   S T A T E S   D I S T R I C T   C O U R T
### D I S T R I C T   O F   N E W   J E R S E Y

MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
**(973) 645-6340**

**WILLIAM J. MARTINI**

**JUDGE**

## LETTER OPINION

August 5, 2008

Kevin Kilcommons
Kilcommons Shanahan, LLC
322 Route 31 North
Annandale, NJ 08801
*Attorney for Plaintiff*

William D. Wallach
Richard Hernandez
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
*Attorneys for Defendants*

Joseph Goldberg
Joel Wolosky
Hodgson Russ LLP
230 Park Avenue, 17th Floor
New York, NY 10169
*Co-attorneys for Defendants*

> Re:   *Pathfinder Management, Inc. v. Mayne Pharma PTY, et al.*
>        Civil Action No. 06-CV-2204 (WJM)

Dear Litigants:

This matter comes before the Court on Defendants' motion to dismiss Plaintiff's Second Amended Complaint.  There was no oral argument.  Fed. R. Civ. P. 78.  For the

reasons stated below, **Defendants' motion** is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This case arises out of the sale and acquisition of two companies in March 2003. Plaintiff Pathfinder Management Inc. ("Pathfinder") purchased two subsidiaries of Defendant Faulding Consumer Holdings, Inc. ("FCHI") in a stock and asset sale pursuant to a Purchase Agreement dated March 10, 2003 ("Purchase Agreement"). (Second Am. Compl. ¶ 19; Hernandez Decl. Ex. 1.) The subsidiaries, Faulding Consumer, Inc. ("FCI") and Faulding Healthcare (IP) Holdings, Inc. ("FHHI") (collectively, the "Acquired Companies"), held certain rights to manufacture, market, and sell sun and skin care products under the label "Sea & Ski." (Hernandez Decl. Ex. 1.) Upon acquisition by Pathfinder, the Acquired Companies were consolidated and became a single entity known as Radiant Technologies, Inc. ("Radiant"). (Second Am. Compl. ¶ 32.)

According to Pathfinder, within months of closing the acquisition, customers returned "Sea & Ski" products at a volume which "vastly exceeded the representations of Defendants' representatives," and significant "credit issues" with customers came to light. *Id*. ¶¶ 28, 39. Pathfinder further alleges that agents of FCHI gave misleading sales and accounting information during the due diligence process and made misrepresentations upon which Pathfinder relied in deciding to enter into the Purchase Agreement. *Id*. ¶¶ 22, 43. Upon discovery of these issues, Pathfinder claims that the Acquired Companies were revealed to be virtually worthless. *Id*. ¶30.

According to the Second Amended Complaint, the alleged facts supporting Pathfinder's claims can be divided broadly into the following four categories.

### A.      Sales Representations in a January 2003 Presentation.

On January 20 and 21, 2003, Andrew Vidler, FCI's former Vice-President,[1] and John Winning, FCI's former national sales manager who became President of Radiant after the acquisition, made the following representations during a due diligence presentation regarding the Acquired Companies' sales: (1) in 2002, gross sales were approximately $8 million and resulted in net sales of $4 million, after deductions for returns and trade credits; (2) the "Sea & Ski" business was 7% of the sun care market; (3) as of January 2003, all material product returns had been accounted for among the major customer accounts; (4) although the Acquired Companies had recently experienced

---

[1] Vidler is also alleged to be a current employee of Defendant Symbion Pharmacy Services, Inc.

significant product returns because of an issue regarding the Asta-Zanthin sunscreen,[2] those problems had since been resolved through reformulation of the product and replacement of the inventory; (5) strong 2003 sales were projected based upon 2002 performance; (6) the "Sea & Ski" brand had strong market acceptance and goodwill with 70% name recognition in consumer surveys; (7) CVS Corporation was a major account with strong projected sales in 2003; (8) Shoppers Drug Mart, a major Canadian customer, was a non-return business with no return exposure; and (9) Associated National Brokerage, an exclusive distributor in Canada, owed an outstanding balance from 2002 in excess of $265,000 and had no right to credit any product returned from its customers delivered prior to December 1, 2002.  *Id*. ¶ 21-22.

B.     **Representations regarding Warehouse Inventory.**

During a warehouse inspection on January 21, 2003 in Pompano Beach, Florida, Pathfinder's representatives were shown racks of the Acquired Companies' product inventory.  *Id*. ¶ 23.  Pathfinder alleges that "the issue of the product containing the old Asta-Zanthin staining formula was discussed, and Pathfinder was specifically told by Defendants' representatives that the inventory shown did not represent any of the defective Asta-Zanthin product, which statements have since been proven false."  *Id*. Pathfinder also alleges that Defendants' warehouse manager, Mitch Saltzman, confirmed that he had heard Vidler and Winning discussing "hiding" the defective Asta-Zanthin product in trailers behind the warehouse, and ultimately deciding to place all of the defective product on the highest racks in the warehouse on the assumption that prospective buyers would not examine product placed in that area.  *Id*. ¶ 39(f).  Pathfinder eventually learned that "the bulk of inventory in the warehouse consisted of defective Asta-Zanthin formula product."  *Id*. ¶ 39(e).

C.     **Representations in March 2003 and on Schedule 2.4(c).**

Pathfinder alleges that during the negotiation process for the Acquired Companies, several representations regarding the credits and liabilities of various customer accounts were made. Defendant Hinchen represented during a March 4, 2003 telephone conference that certain "negative receivables," or credits in favor of retailers, would be more than offset by the net "positive" accounts receivable being assumed by Pathfinder.  *Id*. ¶ 25. Winning repeated and expanded upon this representation in a March 5, 2003 telephone call.  *Id.* ¶ 26.  He explained that the end result of the various receivables would be "a net to the purchaser [Pathfinder] of approximately $1,000,000.00 with some slow pay, against $700,000.00 in credits and liabilities."  *Id*.

---

[2]  The Asta-Zanthin formula apparently resulted in the staining of clothes.

As a result of these representations, Pathfinder renegotiated the Purchase Agreement and assumed liability for all obligations, commitments, returns of product, and employee matters arising on or after the effective date of the transaction under Section 2.4 of the Purchase Agreement. *Id*. ¶ 27. Pathfinder agreed to additionally assume all of the accounts receivable, liabilities, obligations, and commitments arising from those accounts listed in Schedule 2.4(c) of the Purchase Agreement. *Id*. Defendants allegedly represented that Schedule 2.4(c) encompassed the entirety of the additional credits and liabilities that Pathfinder would be assuming, aside from certain liabilities for an outstanding litigation matter involving FCI and Albertson's, Inc., for purchase orders for product, and existing office and warehouse leases. *Id*. ¶¶ 24, 27.

Based on these representations, Pathfinder and Defendants renegotiated the purchase price so that Pathfinder paid an additional $1,100,000 for the assumption of the positive accounts receivable listed on Schedule 2.4(c). *Id*. ¶ 27. Pathfinder alleges that in an audit conducted after Frank Scanlan was fired, it learned that these amounts were "grossly falsified." *Id*. ¶ 38.

### D.     Concealment of Poor Sales Through Accounting Practices.

Pathfinder alleges that poor sales and high returns were concealed by Defendants' accounting practices to avoid disclosing the true sales figures to Pathfinder. Frank Scanlan, the former Controller of FCI who became Controller of Radiant following the acquisitions, was terminated on December 12, 2004 "due to his failure to obey Radiant's directives to correct his odd accounting practices," subsequent to which, an investigation revealed that he had failed to follow accepted accounting procedures by keeping proper records of sales and closing out months during 2003 or 2004. *Id*. ¶ 32. A confidential source cited in the Second Amended Complaint, who is alleged to have had reporting responsibilities to Winning, said that he or she was given directives by Scanlan to create "dummy invoicing" to reflect higher sales numbers so that Pathfinder would be misled, and that Winning sent letters to various retailers guaranteeing profits. *Id*. ¶ 36.

### E.     Complaint and Procedure

On May 9, 2006, Pathfinder brought this lawsuit. An amended complaint was filed in July 2006, and a second amended complaint was filed on February 2, 2007. In addition to FCHI, Pathfinder sues six other corporate defendants, Symbion Health, Ltd., Mayne Pharma PTY, Symbion Pharmacy Services PTY, Ltd., Faulding Heathcare International Holdings, Inc., Faulding Healthcare US Holdings, Inc., and Mayne Pharma (USA), Inc. (all alleged to be "alter egos" of FCHI) and one individual defendant, Stuart Hinchen, president of Mayne Pharma (USA), Inc. The Second Amended Complaint (hereinafter,

"Complaint") alleges eight claims against Defendants:  (1) federal securities fraud; (2) New Jersey Racketeering Influenced and Corrupt Organization Act violations; (3) fraudulent misrepresentation; (4) common law conspiracy; (5) negligent misrepresentation; (6) tortious interference with a potential economic benefit; (7) breach of contract; and (8) breach of implied duty of good faith and fair dealing.

Defendants have moved for dismissal of the Complaint pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure.

## ANALYSIS

**A.        Standard of Review**

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).  In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents, if the plaintiff's claims are based upon those documents.  *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears that no relief could be granted "under any set of facts that could be proved consistent with the allegations," a court may dismiss a complaint for failure to state a claim.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Although a complaint need not contain detailed factual allegations, "the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).  Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level.  *See id.* at 1964-65.  Furthermore, although a court must view the allegations as true in a motion to dismiss, it is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F. 3d 187, 211 (3d Cir. 2007).

**B.   Defendants Mayne Pharma PTY, Symbion Health, Symbion Pharmacy Service, Faulding Healthcare International Holdings, and Faulding Healthcare US**

Defendants argue that the Court lacks personal jurisdiction over the five corporate non-resident Defendants: Mayne Pharma PTY, Symbion Health, Ltd., Symbion Pharmacy Service PTY, Ltd., Faulding Healthcare International Holdings, Inc., and Faulding Healthcare US Holdings, Inc. (collectively, "Non-Resident Defendants").[3]  Plaintiff disagrees and argues that the Complaint sufficiently establishes both general and specific personal jurisdiction under an alter ego theory.

In New Jersey, the appropriate exercise of personal jurisdiction over non-resident defendants is allowed to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment.  *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004).  To assert *in personam* jurisdiction over a non-resident defendant consistent with the Fourteenth Amendment, a plaintiff must show that the defendant had minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).

Personal jurisdiction arises when the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  In other words, a defendant must have engaged in some purposeful conduct within the forum "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980).  To demonstrate such conduct, a "plaintiff must establish either that the particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that the defendant has 'continuous and systematic' contacts with the forum state ('general jurisdiction')."  *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414, 416 (1984)).

A motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) shifts the burden to the plaintiff to establish sufficient facts showing that jurisdiction is proper.  *See Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).  As this court has not held an evidentiary hearing on the motion to dismiss for lack of personal jurisdiction, the "plaintiff need only establish a prima facie case of personal jurisdiction," and the Court must accept Plaintiff's allegations as true and resolve all disputed facts in its favor.  *Miller Yacht Sales*, 384 F.3d at 97.

---

[3] Defendants do not contest personal jurisdiction as to FCHI, Mayne Pharma (USA), Inc. or the sole individual defendant, Stuart Hinchen.  (Defs.' Br. 2.)

6

1.      *General Personal Jurisdiction*

Plaintiff asserts that general jurisdiction over Non-Resident Defendants is appropriate because the Complaint adequately alleged jurisdiction through a piercing the corporate veil theory.[4]  This theory would impute the forum contacts of a subsidiary corporation to a parent corporation for jurisdictional purposes if the subsidiary is deemed an alter ego of the parent.  *See Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 610 (D.N.J. 2004).  Defendants argue that mere conclusory allegations asserting various defendants as alter egos of other defendants is insufficient to establish general personal jurisdiction, and the Court agrees.  Even viewing the facts alleged as true and resolving all factual disputes in Plaintiff's favor, Plaintiff has failed to plead the necessary facts establishing a piercing of the corporate veil under an alter ego theory.

Piercing the corporate veil is an equitable tool used by courts to provide a "remedy that is involved when [a subservient] corporation is acting as an alter ego of [a dominant corporation.]"  *Bd of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002).  In New Jersey, the presumption is that "a corporation is a separate entity from its shareholders . . ., and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise."  *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988)(citations omitted).  Thus, limited liability will not be abrogated "even in the case of a parent corporation and its wholly-owned subsidiary" unless (1) "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent," and (2) "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law."  *Id*. (quotations omitted); *see also Bd. Of Trs.*, 296 F.3d at 171.

---

[4] If Plaintiff is unable to establish success on a piercing the corporate veil theory, the Court finds that the alleged facts fail to establish general personal jurisdiction on other grounds.  Defendants submitted an affidavit stating that three of the defendants, Mayne Pharma PTY, Symbion Health, Ltd., and Symbion Pharmacy Services PTY, Ltd., are Australian companies. (Loftus Decl. ¶¶ 2-4.)  Furthermore, the affidavit states that Symbion Pharmacy Services PTY, Ltd. conducts no business in the United States, and that Mayne Pharma PTY and Symbion Health, Ltd. are holding companies which conduct no business on their own behalf in the United States.  *Id.*  The two other defendants, as to whom personal jurisdiction is contested, are Faulding Healthcare International Holdings, Inc. and Faulding Healthcare US Holdings, Inc., both of which were based in Delaware, but were dissolved on June 23, 2005 and no longer conduct business anywhere.  *Id.*  The affidavit states that none of these five companies has any contacts with, or any agents in, New Jersey.  *Id.*  Thus, the Court is satisfied that the submitted affidavit is sufficient to establish, and Plaintiff does not dispute, that Non-Resident Defendants did not have the "systematic" or "continuous" contacts with New Jersey necessary to establish general jurisdiction directly.

Piercing the corporate veil "depends on a finding of dominance," and "only after there has been such a finding does one reach the fraud or injustice issue." *Craig*, 843 F.2d at 149 (quotations omitted). Dominance is not just ownership or control over stock but rather "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Id*. at 150. In determining whether to pierce the corporate veil on an alter ego theory, courts have considered certain factors including: "(1) the level of capitalization of the subsidiary; (2) who the subsidiary does business with other than the parent; (3) the day-to-day involvement of the parent's directors, officers and personnel with the subsidiary; and (4) the payment of the subsidiary's salaries and expenses by the parent." *Seltzer*, 339 F. Supp. 2d at 610. The mere fact that a corporation's boards of directors or officers overlap cannot establish a parent's domination or control of the subsidiary. *See Premier Pork L.L.C. v. Westin, Inc*., No. 07-1661, 2008 U.S. Dist. LEXIS 20532 (D.N.J. March 17, 2008).

In this case, the Complaint merely states, in a wholly conclusory fashion, that: (1) FCHI and Mayne Pharma (USA) are "alter egos" of the Non-Resident Defendants; (2) product returns and credits were known to these defendants and concealed by them; (3) three employees of FCHI, Andrew Vidler, John Winning, and Frank Scalan, "reported directly to the Mayne Group;" and (4) Vidler had been sent to the United States by Mayne Pharma PTY or one of its alter egos for the specific purpose of selling the Acquired Companies. (Second Am. Compl. ¶¶ 15, 21, 29-30.) In Plaintiff's opposition to the motion, Plaintiff submits that alleging an alter ego theory is sufficient without pleading any of its elements, and "all the corporate Defendants should remain in the suit and permit Plaintiff the right to discover the interrelationship among these several entities." (Pl.'s Opp. Br. 18.)

In the absence of any allegations or evidence that FCHI and/or Mayne Pharma (USA) were controlled or dominated by Non-Resident Defendants, the Court cannot find that Plaintiff has met the pleading requirements to establish this Court's personal jurisdiction over Non-Resident Defendants. The facts alleged in the Complaint, even taken as true and viewing reasonable inferences in Plaintiff's favor, are insufficient to plead dominance by any of Non-Resident Defendants. First, mere conclusory allegations, that Plaintiff hopes might later be established from some set of undisclosed facts, fail even the liberal pleading standards of Fed. R. Civ. P. 8. *See Baraka*, 481 F. 3d at 211 (a legal conclusion is not a factual allegation). The necessary facts to establish the elements of its legal conclusion are noticeably absent from the Complaint, and such a pleading is prohibited in the most recent articulation of the standard for notice pleading. *See Bell Atlantic Corp.*, 127 S. Ct. at 1968-69. Second, the fact that Non-Resident Defendants' knew of the product returns and credits and that Vidler had been tasked with selling the

Acquired Companies could potential support an allegation of fraud, but does not support a claim of domination.  Finally, that certain employees reported directly to unspecified Non-Resident Defendants or would work for one of the Non-Resident Defendants after the sale of the Acquired Companies is not sufficient to establish domination.  *See Seltzer*, 339 F. Supp. 2d at 610 (overlapping boards of directors or an employee's concurrent position at a parent and a subsidiary company are alone insufficient to establish an alter ego relationship).

The burden rests with Plaintiff to demonstrate that any of the Non-Resident Defendants dominated the business activities of FCHI or Mayne Pharma (USA) such that they disregarded the independence of their corporate existence.  Plaintiff has simply failed to plead any facts to suggest that the relationship between the companies is anything other than the "bona fide parent/subsidiary relationship which legitimately insulates one [from] the liabilities of the other."  *Id*. at 611.  Thus, without a basis to pierce the corporate veil, the Court must conclude that the allegations do not establish general personal jurisdiction over Non-Resident Defendants.

2.    *Specific Personal Jurisdiction*

In analyzing specific personal jurisdiction, courts are directed to examine the relationship among the parties, the forum, and the litigation.  *Miller Yacht Sales*, 384 F.3d at 96 (citation omitted).  A single contact with the forum can be sufficient to create a substantial connection, so long as the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).  Exercising jurisdiction in such a case must also comport with fair play and substantial justice.  *Id*. at 476.

Plaintiff asserts that there is specific personal jurisdiction over Non-Resident Defendants due to the alleged agency/alter ego relationship between Mayne Pharma (USA) and Non-Resident Defendants during the course of the sale and purchase of the Acquired Companies.  Plaintiff rests predominately on the same alleged facts discussed in the Court's analysis of general personal jurisdiction.  To the extent that those alleged facts are the basis upon which Plaintiff seeks piercing of the corporate veil, the Court must again conclude that the elements of agency and alter ego were not properly pled.  *See Seltzer*, 339 F. Supp. 2d at 610 (an agency relationship arises when the principal controls and directs the acts of the agent)(quotations omitted).  Although Plaintiff states that John Winning and Frank Scalan reported directly to the Mayne Group (Second Am. Compl. ¶ 30.), Plaintiff fails to establish that the contacts between the Mayne Group and these defendants were related to the sale and purchase of the Acquired Companies.  The lacking

of specificity regarding which entity is purported to have sent Defendant Vidler to the forum state for the purpose of selling the Acquired Companies similarly defeats Plaintiff's attempt to establish jurisdiction over Non-Resident Defendants.

In addition to the alleged facts cited above, Plaintiff adds that the Purchase Agreement was signed by Defendant Hinchen on behalf of FCHI.  (Pl.'s Opp. Br. 22.) Defendant Hinchen is also alleged to have signed certain agreements on behalf of Mayne Pharma (USA) and the Acquired Companies.[5]  *Id.*  With respect to Non-Resident Defendants, however, the allegation of agency is again merely conclusory.  In the Complaint, there are no facts alleged that give rise to a conclusion that Non-Resident Defendants had "any power to sign contracts on behalf of [the parent] or to bind it in any way," the ability to "place or accept orders on behalf of the parent," or "do all of the business [the parent] could do were its own officials present in [the forum state]." *Seltzer*, 339 F. Supp. 2d at 609-10 (citing *Tsegaye v. Impol Aluminum Corp.*, No. 01-5943, 2003 U.S. Dist. LEXIS 1397 (S.D.N.Y. Jan. 30, 2003)).  Thus, the Court finds that it lacks specific personal jurisdiction over Non-Resident Defendants.

***

Based on the foregoing, Defendants' motion to dismiss Plaintiff's Complaint as against Defendants Symbion Health, Ltd., Symbion Pharmacy Services PTY, Ltd., Mayne Pharma PTY, Faulding Healthcare International Holdings, Inc., and Faulding Healthcare US Holdings, Inc. is granted.

**C.    Count One:  Securities Fraud**

In Count One, Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j.(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and alleges specifically that Defendants made misstatements or omissions of material fact, with knowledge or recklessness, in connection with the purchase or sale of a security, upon which Plaintiff reasonably relied and consequently suffered injury.  (Second Am. Compl. ¶¶ 41-44.)  Defendants argue that the securities fraud claim is deficient because it is barred by the applicable statute of limitations and

_____

[5] Plaintiff argues that a proper agency relationship between Defendants Hinchen and Mayne Pharma (USA) Inc. was established when Defendant Hinchen signed agreements with Plaintiff on Mayne Pharma (USA) Inc.'s behalf.  Furthermore, a representative of Mayne Pharma (USA) Inc. is alleged to have participated in misrepresenting the inventory of products during Plaintiff's warehouse inspection. Thus, the Court is satisfied that Plaintiff has sufficiently alleged a claim against Defendant Mayne Pharma (USA) Inc.

fails to meet the pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation and Reform Act (the "PSLRA").  The Court addresses the arguments in turn.

### 1.  Statute of Limitations

For securities fraud actions, the statute of limitations under 28 U.S.C. § 1658 is two years after the discovery of the facts constituting the violation or five years after such violation, whichever is earlier.  The two-year statute of limitations begins to run when a plaintiff is on inquiry notice as to the existence of fraud.  *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 416 (D.N.J. 2005).  Such a plaintiff is put on inquiry notice when a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."  *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006).  Information that may constitute inquiry notice includes: "substantial conflicts between oral representations of the brokers and the text of the prospectus, . . . the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions have been made."  *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d at 417.  Courts have acknowledged that the "timing of a plaintiff's knowledge of his claim is a 'fact-intensive inquiry.'"  *Id*. at 416.

The defendant bears the initial burden of showing the existence of storm warnings.  *Id*. at 417.  If "the existence of storm warnings [is] adequately established 'the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries.'"  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1327 (3d Cir.  2002)(quoting *Matthews v. Kidder, Peabody, Co., Inc*., 260 F.3d 239, 252 (3d Cir. 2001)).  Plaintiffs need not know all of the details or "narrow aspects" of the alleged fraud to trigger the limitations period; instead, the period begins to run from the time at which plaintiff should have discovered the general fraudulent scheme.  *NAHC*, 306 F.3d at 1326.

The initial complaint in this matter was filed on May 9, 2006, so the action is time-barred if Plaintiff was on inquiry notice of the fraud prior to May 9, 2004.[6]  Defendants argue that Plaintiff was on inquiry notice within months of the closing in January 2003. (Defs.' Br. 26.)  They point to Plaintiff's allegations in the Complaint that: (1) "[w]ithin months of the closing, and up to and including December 2005, Pathfinder experienced return products from many of Defendants' customers, which vastly exceeded the

---

[6] There is no argument that the Complaint was brought after the outer bounds of the statute of limitations period – five years.

representations of Defendants' representatives;" and (2) prior to closing, "Defendants posted returns in excess of $3 million."  (Second Am. Compl. ¶¶ 28-29.)  Thus, Defendants seek dismissal of Count One for Plaintiff's failure to timely investigate the alleged fraud and file suit within two years of notice of a fraud claim.

The Court finds that the allegations in the Complaint do not necessitate a dismissal of the securities fraud count on statute of limitations grounds.  Putting aside the issue of whether the securities claim was properly pled, Plaintiff's argument that it was placed on inquiry notice on December 12, 2004 when Plaintiff investigated the "odd accounting practices" of Radiant's controller, Frank Scanlan, is consistent with the facts as alleged in the Complaint.  Plaintiff alleges that it experienced returns of the product within months of the closing through December 2005 which exceeded the Defendants' representations.  *Id*. ¶ 28.  It is unclear at what point during this time period the returns exceeded the representations, thus the Court is unable to determine without additional facts that Plaintiff was on inquiry notice prior to December 2004.  With respect to the irregular accounting of returns and sales, Plaintiff alleges that there was active concealment of the fraud by John Winning, Frank Scanlan, and John Vidler.  *Id*. ¶¶ 29-32.  Plaintiff alleges in the Complaint that Winning and Scanlan were aware of the problems prior to closing, and "perpetuated the concealment" of the correct sales and accounting figures after the closing as they continued to work as employees of the Acquired Companies.  *Id*. ¶ 30.  Plaintiff also alleges that "[b]ecause of the nature of the sun care industry and the timing of the closing of the ... transaction, the 2004 sales season was already underway, allowing for the ongoing concealment of the facts with respect to the sales and accounting for both the 2002 and 2003 sales seasons."  *Id*. ¶ 31.

Defendants have not provided any other evidence to suggest that Plaintiff was on inquiry notice, and have therefore not met their burden of adequately establishing that there were "storm warnings" of misrepresentations and fraud.  As a reasonable investor would not likely have discovered fraud, where as alleged here, the participants in the fraud attempted to conceal their fraudulent actions, the Court cannot conclude that Plaintiff was on inquiry notice prior to December 12, 2004.

 *2.* *PSLRA.*

To plead a violation under Section 10(b) and Rule 10b-5, plaintiffs must allege with particularity that a defendant (1) made a misstatement or omission of material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied (5) leading to an economic loss (6) that was the proximate cause of their injury.  *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir.

2004)(citations omitted).  Fed. R. Civ. P. Rule 9(b)'s requirement that in all fraud cases, the circumstances constituting the fraud must be stated with particularity is "rigorously applied in securities fraud cases."  *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1417 (3d Cir. 1997).  The PSLRA imposes an additional layer of particularity and requires that plaintiffs "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  It also provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id*.  Essentially, Plaintiff must plead the details of who was involved in the alleged fraud, where and when the contested events and statements took place, and why any statements made by the defendants were misleading.

Defendants argue that the Complaint fails to meet the Rule 9(b) standard for pleading fraud with particularity, let alone the more stringent requirements under the PSLRA.  Specifically, Defendants contend that Plaintiff has failed to sufficiently plead: (1) the alleged misstatements and omissions with particularity, (2) facts evidencing scienter, and (3) the reasonableness of Plaintiff's purported reliance on the misstatements or omissions.

i.    *Misstatements and Omissions*

Plaintiff insists that the Complaint lays forth with sufficient particularity the misstatements and omissions constituting the securities fraud claim.  Plaintiff directs the Court's attention to the following alleged misstatements set forth in the Complaint: (1) Vidler and Winning's representations in a due diligence presentation in January 20-21, 2003 regarding gross and net sales in 2002, the market share of the Acquired Companies in the sun care market, the accounting for material returns among the major accounts, the reformulation of the Asta-Zanthin sun screen formula, the replacement of defective inventory, projected 2003 sales, Acquired Companies' brand recognition and market acceptance, and the identity and characterization of certain customers, including CVS, Shoppers Drug Mart, and Associated National Brokerage, (Second Am. Compl. ¶ 22); (2) Hinchen, Winning, Vidler, and Erin Zaccaro of Mayne Pharma (USA), Inc., and Mitch Saltzman's representations that the inventory shown displayed in the warehouse during a warehouse inspection on January 21, 2003 did not contain the defective Asta-Zanthin formula; (3) Hinchen's statements, made after February 28, 2003 and "shortly before the execution of the Agreement," regarding the existence of a "positive" accounts receivable representing "new money" that fell outside of Plaintiff's due diligence investigation with respect to Long's Drugs; (4) March 5, 2003 representations made by Hinchen and their attorney regarding positive and negative receivables of certain customers; (5) March 5, 2003 representations by Winning regarding credits and liabilities; and (6) the sales

representations made in Schedule 2.4.(c) of the Purchase Agreement prior to its execution.

The Court upon review of the Complaint is not satisfied that all of the alleged misstatements and omissions were pled with sufficient specificity. Although Plaintiff identified the author of the misstatements, where and when the statements were made, and to whom the statements and representations were made, Plaintiff has in several instances failed to plead essential facts to support its conclusion that those representations were false or misleading.[7]

Plaintiff has alleged the following supporting facts. First, the Complaint alleges that there were product returns exceeding the representations made by Vidler, Winning, and Scanlan, and that those returns impacted the past and anticipated credits and sales from the Acquired Companies' customers. Specifically, certain retailers, Duane Reade, Longs, CVS, Kroger, Walgreen's and Rite Aid, had credit issues, with CVS amounting to a $213,000 "hit" with "co-op offsets of $61,000." (Second Am. Compl. ¶ 33.) Second, according to a confidential source who had reporting responsibilities to Winning, Winning, Vidler, and Scanlan directed the false inflation of sales figures, false invoicing, and "lying to consumer[s], retailer[s] and broker[s] regarding 'astaZanthin' and bad 'polargell' products that Winning continued to sell to the trade."[8] *Id*. ¶ 36. Third, an accounting of a sales database as of the date of closing in April 2003 revealed that the actual sales information was at gross variance from the information disclosed in Schedule 2.4(c). *Id*. ¶ 37.

In light of these allegations, the Court finds that Plaintiff has adequately pled the following material misstatements and omissions with sufficient particularity: (1) 2002 sales; (2) 2003 projected sales; (3) identity and characterization of certain customers, including CVS, Shoppers Drug Mart, and Associated National Brokerage, in a due

---

[7] The Court notes that whether such statements can be attributed to the individual corporate defendants is currently not before this Court.

[8] Pleading factual detail provided by confidential sources is an appropriate basis to plead a fraud claim where the Court examines the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Cal. Pub. Emples.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). In this case, Plaintiff relies upon a confidential former employee who would likely have had knowledge regarding the alleged inflation of sales figures. This information was corroborated by an investigation led by the companies' new comptroller, which revealed that Scanlan failed to follow accepted accounting procedures and did not store or save sales data for the fiscal years 2003 and 2004. (Second Am. Compl. ¶ 32.) Thus, the Court is satisfied that the confidential informant's information is sufficient to support a claim of securities fraud.

diligence presentation in January 20-21, 2003; (4) representations by Vidler and Winning that the warehoused inventory did not contain any of the defective sunscreen product; (5) Hinchen's statements regarding Long's Drugs' accounts receivable; (6) the March 5, 2003 representations regarding the credits and receivables of certain customers; and (7) the representations made in the Schedule 2.4(c).

The facts as pled, however, are insufficient to support certain alleged misrepresentations and misstatements.  First, Plaintiff fails to explain how the representations regarding the market share of "Sea & Ski" and lack of market acceptance was fraudulent, other than to state that it was "upon information and belief," without citing the basis for this belief.  Second, Plaintiff has failed to explain how Defendants' alleged representations during the January 2003 due diligence presentation were false regarding the resolution of the sunscreen product staining issue through the reformulation of the product and replacement of the bulk of the inventory.  The Court, therefore, finds that the Complaint fails to support these remaining alleged misrepresentations with the particularity required under Fed. R. Civ. P. 9(b) and the PSLRA.

### ii.    Scienter

In a securities fraud case, the requisite state of mind must be intentional–in the form of conscious misbehavior or recklessness.  *See GSC*, 368 F.3d at 236.  The PSLRA requires plaintiffs "with respect to each act or omission" to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  This requirement supercedes Rule 9(b)'s provision allowing plaintiffs to plead states of mind generally.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1328 (citations omitted).  Furthermore, group pleading of scienter is not allowed under the PSLRA, and Plaintiff must specify scienter either directly or indirectly with respect to each defendant.  *See Winer Family Trust v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007).

A court reviewing a motion to dismiss for failure to sufficiently plead scienter

must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as 'strong' within the intendment of [15 U.S.C. § 78u-4(b)(2)], [ ] an inference of scienter must be more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05, 168 L. Ed. 2d 179 (2007). In making this determination, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . . The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 2509 (emphasis in original).

Scienter can be adduced inferentially by either: (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud, or [2] alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund*, 368 F.3d 228, 237 (3d Cir. 2004). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp*., 180 F.3d at 535 (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979)). "[S]cienter may be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." *Id*.

It is clear that certain allegations are sufficient to implicate scienter with respect to Vidler and Winning's alleged misstatements regarding the contents of the warehouse. Mitch Saltzman, a warehouse manager, related to Mitch Gray, the CEO of Radiant, "that in his presence Vidler and Winning discussed 'hiding' this Asta-Zanthin inventory in trailers behind the warehouse, but ultimately they opted to place all of this inventory on the highest racks in the warehouse on the assumption that prospective buyers would not inspect the inventory stored there." (Second Am. Compl. ¶ 39(f).) The acts of concealment and statements of fraudulent intent are sufficient to demonstrate a strong inference of scienter. Additionally, to the extent that sales and accounting information were inflated and falsely adjusted under Vidler, Winning, and Scanlan's direction based upon information supplied by a confidential source, there is sufficient evidence of a strong inference of scienter as to alleged misrepresentations regarding sales and accounting on the part of Vidler and Winning and any person for whom they acted as agents.[9]

The Court, however, is unable to conclude that Plaintiff has sufficiently alleged facts that show strong circumstantial evidence of conscious misbehavior or recklessness

---

[9] The Complaint fails to adequately plead sufficient elements demonstrating which, if any, Defendants Vidler, Winning, and Scanlan were purporting to represent as an agent. Thus, the Court is unable to conclude which additional Defendants, if any, can additionally be held liable for the actions of its agent.

with respect to all of the alleged misrepresentations.  The mere fact that Vidler, Scanlan, Hinchen, and Winning made statements which they knew to be false or should have known were false is insufficient to meet the heightened pleading requirements.  *See GSC*, 368 F.3d at 239 ("it is not enough for plaintiffs to merely allege that defendants 'knew their statements were fraudulent or that defendants 'must have known' their statements were false").  For example, Defendant Hinchen is alleged to have misrepresented that approximately $1 million in positive accounts receivable represented "new money" which "fell outside of [Pathfinder's] due diligence investigation."  (Second Am. Compl. ¶ 25.)  As Plaintiff has not alleged any facts that would demonstrate Defendant Hinchen's actual knowledge of the misrepresentation or intent to consciously or recklessly disclose a misrepresentation, Plaintiff has failed to plead scienter with respect to Defendant Hinchen.  *See, e.g., GSC*, 368 F.3d at 244 (finding a lack of scienter where there were no evidence to suggest that a person making the alleged misrepresentation had "actual knowledge that the unaudited financial statements . . . were unreliable" or that there was an extreme departure from the ordinary standards of care).

To the extent that Plaintiff relies upon inferential evidence of Defendants' scienter based on motive and opportunity to commit fraud, the Complaint falls short of establishing the requisite scienter.  The Court is not persuaded by Plaintiff's argument that the combination of Defendants' motivation to "avoid the substantial costs, which would have been sustained had the Acquired Companies been closed, rather than sold to an unsuspecting party" and opportunity to misrepresent and actively conceal meets the requisite element of scienter.  (Pl.'s Br. 29.)  A general "desire to increase stock price, to consummate a transaction, or to eliminate competitors is insufficient to create a strong inference of scienter as a matter of law."  *In re Bio-Technology General Corp. Securities Litig.*, 380 F. Supp. 2d 574, 587 (D.N.J. 2005).  Such motivations are inherent in any transaction, and are therefore not concrete and personalized.

   *iii.*  *Reliance.*

In a Rule 10b-5 claim, a plaintiff must plead reasonable reliance on the fraudulent misrepresentation or omission.  *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000).  Defendants argue that Plaintiff cannot sufficiently establish this element because Plaintiff's reliance was unreasonable in light of the circumstances surrounding the arms length transaction and the integrated non-reliance clause in the Purchase Agreement.  (Defs.' Br. 23-24.)  The Court finds that at the motion to dismiss stage, adequate reliance has been pled.  Whether or not this reliance was reasonable in light of the circumstances and the Purchase Agreement is more appropriately resolved at a later stage in the proceedings.  The Court at this juncture cannot conclude as a matter of law that the existence of a non-reliance clause or the nature of the arms length transaction

precludes Plaintiff's securities fraud claim.  *See AES Corp. v. The Dow Chemical Co.*, 325 F.3d 174, 181 (3d Cir. 2003)("[C]ases involving a non-reliance clause in a negotiated contract between sophisticated parties will often be appropriate candidates for resolution at the summary judgment stage. We are unwilling, however, to hold that the extraction of a non-reliance clause, even from a sophisticated buyer, will always provide immunity from Rule 10b-5 fraud liability.").

> iv.   Remedy

Fed. R. Civ. P. 15(a) provides that courts "should freely give leave [to amend] when justice so requires."  Generally, leave to amend is granted when a complaint is dismissed for failure to plead with particularity.  *NAHC*, 306 F.3d at 1332.  Where amendment would be futile, however, a court may deny such a motion.  *Id*. (leave to amend is "often denied on other grounds, such as undue delay, bad faith, dilatory motive, prejudice and futility")(quotations omitted).  Although this Court has allowed Plaintiff to amend its complaint on two prior occasions, the Court cannot conclude at this time that viewing the facts most favorably for Plaintiff that an amendment of the pleadings would be futile.  Furthermore, there is no evidence of undue delay, bad faith, dilatory motive, or prejudice.  Thus, the Court will narrowly grant leave for Plaintiff to file a final amended complaint within fifteen (15) days of this Letter Opinion and Order to cure, consistent with this Court's Letter Opinion, the identified failure to plead its securities fraud claims with the specificity required under Rule 9(b) and the PSLRA.

**D.    Count Two: New Jersey RICO**

Defendants move to dismiss the New Jersey RICO count for failure to state a claim.  Specifically, Defendants dispute that the sale and purchase of the Acquired Companies constituted an enterprise which engaged in a pattern of racketeering activity involving fraudulent practices in violation of N.J.S.A. § 2C:41-1, *et seq*.  Plaintiff argues that the elements for establishing a New Jersey RICO claim have been sufficiently pled. The Court disagrees.

New Jersey RICO provides that "[a]ny person damaged in his business or property by reason of a violation of [N.J.S.A.] § 2C:41-2 may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of the suit. . . ." N.J.S.A. § 2C:41-4(c).  One of the elements of a New Jersey RICO claim is that the defendants engaged in "a pattern of racketeering activity" consisting of predicate acts.  N.J.S.A. § 2C:41-2(a); *see also State v. Ball*, 141 N.J. 142, 161-62 (N.J. 1995).  A pattern of racketeering is defined in pertinent part as "[e]ngaging in at least two incidents of racketeering conduct . . . ; and [a] showing that the incidents of racketeering activity

embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. § 2C:41-1(d). Furthermore, a plaintiff must also show that the racketeering acts are related and that they amount to or pose a threat of continued criminal activity. *Ball*, 141 N.J. at 168.

The Complaint in this case fails to allege either a pattern, or a threat of continued criminal activity. Plaintiff alleges that the sale of the "two separate and distinct entities" amounts to a "pattern" of racketeering activity for purposes of New Jersey RICO, even though the sale was accomplished in a single transaction through a single purchase agreement. This argument has no basis in the caselaw and defies reason. *See, e.g., Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990)(a single episode of real estate fraud lasting a year is not a racketeering activity of a continuing nature). The single sale of two assets pursuant to one agreement is not a pattern for purposes of establishing liability under the statute. Furthermore, there is no threat of additional repeated criminal conduct.[10] Thus, the New Jersey RICO count will be dismissed.

## E.      Counts Three and Five: Fraudulent & Negligent Misrepresentation

Counts Three and Five allege fraudulent and negligent misrepresentation. The alleged misrepresentations are numerous and are detailed in the Complaint, including the representations made in Schedule 2.4(c) of the Purchase Agreement. (Second Am. Compl. ¶ 39.) Defendants argue that the parol evidence rule bars consideration of the alleged oral misrepresentations made in the course of negotiations, because all such representations are specifically disclaimed and contradicted by the Purchase Agreement. *(*Hernandez Decl. Ex. 1 § 8.7); (Defs.' Br. 8-10)(summarizing disclaimers).

To prove a claim for common law fraudulent misrepresentation,[11] a plaintiff must allege a "material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by [the plaintiff] to [his] detriment." *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624 (N.J. 1981). The parol evidence rule prohibits the introduction of oral promises to alter or vary an integrated agreement. *Filmlife, Inc. v. Mal "Z" Ena, Inc*., 251 N.J.

---

[10] Plaintiff argues that there are continuing threats of harm. (Pl.'s Opp. Br. 39.) The relevant test for determining a pattern of racketeering activity is not the continuing nature of the harm caused by the racketeering act, but rather the continuing nature of the conduct. In this case, Plaintiff does not assert that there is a threat of repeated conduct.

[11] A claim for negligent misrepresentation is similar to that of fraudulent misrepresentation to the extent that a plaintiff must show justifiable reliance. Therefore, the same analysis applies.

Super. 570, 573 (App. Div. 1991). Written representations in an agreement, however, do
not create an absolute defense or bar the introduction of parol evidence when the claim
involves allegations of fraud. *See Ocean Cape Hotel Corp. v. Masefield Corp*., 63 N.J.
Super. 369, 378 (App. Div. 1960). The fraud exception for parol evidence is unavailable
where an alleged oral representation is expressly contradicted in a written agreement.
*Filmlife, Inc*., 251 N.J. Super. at 574-75.

In this case, the Purchase Agreement expressly limits the representations that the
purchaser, Plaintiff, may rely upon:

> Section 3.17 (No Other Representations or Warranties): Except for the
> representations and warranties contained in this Article 3 (including the
> Schedules) and the Related Instruments, the Seller makes no other express
> or implied representation or warranty on behalf of the Seller or any of their
> Affiliates. . . . .

> Section 8.7(d) (Sole Remedy; No Additional Representations): The
> Purchaser acknowledges that none of the Seller, their Affiliates or any other
> Person has made any representation or warranty, expressed or implied as to
> the accuracy or completeness of any information regarding the Business
> furnished or made available to The Purchaser and its representatives, except
> as expressly set forth in this Agreement (including the Schedules) or the
> Related Instruments, and none of the Seller . . . shall have or be subject to
> any liability to the Purchaser or any other Person resulting from the
> distribution to the Purchaser, or the Purchaser's use of, any such
> information, documents or material made available to the Purchaser in any
> "data rooms", management presentations or in any other form in
> expectation of the transactions contemplated hereby except to the extent
> such information, documents, or materials is included in the representations
> . . . of the Seller . . ..

> Section 8.7(e): The Purchaser also acknowledges that except as expressly
> set forth in the representations and warranties set for in Article 3 of this
> Agreement (including the Schedules), Related Instrument or the Seller's
> Officer's Certificate, there are no representations or warranties by the Seller
> of any kind, express or implied, with respect to the Acquired Assets . . ..

(Hernandez Decl. Ex. 1.)

The representations set forth in ¶ 39 of the Amended Complaint, to the extent that
they are based upon representations made outside of the Purchase Agreement cannot be

the basis for alleging fraudulent misrepresentation or fraud in the inducement.  Since the Purchase Agreement explicitly states that Plaintiff is aware that no representations are being made to them outside those contained within the Purchase Agreement and specified schedules and instruments, the representations made by Vidler and Winning in the January 2003 presentation cannot be justifiably relied upon by Plaintiff.  Courts in similar situations have ruled that these types of express disclaimers are sufficient to bar a plaintiff's claim of fraud.  *See Travelodge Hotels, Inc. v. Honeysuckle Enterprises Inc.*, 244 Fed. Appx. 522, 526 (3d Cir. 2007)(reliance on a report whose substance was not contained in a franchise agreement and expressly disclaimed in the agreement fails to establish a claim of fraud); *Filmlife, Inc.*, 251 N.J. Super. at 575 (the express terms of a written agreement cannot be modified by extrinsic evidence that would vary the express terms).

The Court, however, notes that several of the alleged misstatements do survive the motion to dismiss as they relate to representations expressly made in the Purchase Agreement.  For example, the representations made regarding the 2002 sales figures as described in Section 3.6 and Schedule 3.6, representations regarding an absence of material adverse change in the business or the results of operations of the business, and representations regarding the account receivables and related liabilities in Section 2.4 and Schedule 2.4[12] are all sources of potential fraudulent misrepresentations based upon ¶ 39 of the Amended Complaint.  As the Complaint appears to identify only representations made during the due diligence period and fails to identify any specific misrepresentations in Purchase Agreement, this Court must find that Plaintiff has failed to state a claim for common law fraudulent and negligent misrepresentation.  The Court will narrowly grant leave for Plaintiff to file a final amended complaint within fifteen (15) days of this Letter Opinion and Order to identify, consistent with this Court's Letter Opinion, which representations listed in ¶ 39, if any, are based upon the Purchase Agreement.

**F.      Count Six: Tortious Interference with Potential Economic Benefit**

---

[12]  Plaintiff identifies Schedule 2.4(c), a list of accounts, as a misrepresentation that is part of the Purchase Agreement, because the amounts listed for the various accounts are allegedly inflated or incorrect.  Defendants argue that on its face and as characterized in the Purchase Agreement, Schedule 2.4(c) is not represented to be an exhaustive accounting of the balances for the various accounts, but rather a list of accounts for which the Purchaser assumed liability for any credits or obligations arising out of or relating to those accounts.  At this stage, the Court cannot resolve on the face of the contract whether the parties intended Schedule 2.4(c) to represent a complete accounting or merely a list of which accounts Plaintiff would be assuming.  Thus, in viewing the allegations in a light most favorably for Plaintiff, the Court finds that Schedule 2.4(c) was an express representation made under the Agreement.

A claim for tortious interference with a prospective economic relationship requires a plaintiff to allege that: (1) the plaintiff had a reasonable expectation of economic benefit; (2) "the interference [with the economic relationship] was done intentionally and with 'malice';" (3) the "interference caused the loss of the prospective gain;" and (4) the injury caused damage. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-52 (1989). The term "malice" in tortious interference claims means that "the harm was inflicted intentionally and without justification or excuse." *Id.* at 751.

Plaintiff has failed to properly allege the second and third elements of this tort. In the Complaint, Plaintiff states that John Winning, a national sales manager of FCI, represented to an FCI customer that certain debts would be forgiven by FCI. (Second Am. Compl. ¶ 71.) The Complaint, then, summarily characterizes that "Defendants misrepresented that [FCI's customer] had no right to credit any product returned," and that "Defendants' contrary statements to Pathfinder effectively put it and [FCI's customer] on a collision course, which has led to litigation in Canada between these companies." *Id.* ¶¶ 70, 72. Although Plaintiff has alleged that Winning, among others, "reported directly to the Mayne Group," Plaintiff does not allege any facts to support its summary conclusion that any named defendant in this action interfered intentionally and with malice either directly, or indirectly through Winning. *Id.* ¶ 30. Furthermore, Plaintiff does not allege any facts suggesting that the unspecified litigation led to the loss of a prospective economic advantage. Although a complaint need not plead detailed factual allegations, it must not be merely a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp.*, 127 S.Ct. at 1965. Thus, the Court finds that Plaintiff has failed to state a claim of tortious interference with an economic relationship. The Court narrowly grants leave for Plaintiff to file a final amended complaint within fifteen (15) days of this Letter Opinion and Order to cure, consistent with this Court's Letter Opinion, the failed pleading.

Defendants' second argument that this tort claim is barred by the express language of the limitation of remedy provision in the Purchase Agreement fails. Section 8.7(a) states that "each of the Purchaser and the Seller hereby waive, from and after Closing, to the fullest extent permitted under applicable law, any and all rights, claims and causes of action relating to this Agreement . . .." (Hernandez Decl. Ex. A.) This limitation of remedy provision, however, creates an exception for those claims, "of, or cause of action arising from, fraud or relating to breaches of covenants requiring performance after the Closing Date." *Id.* Even assuming, as urged by Defendants, that this provision limits non-fraud based causes of action, the Court cannot at this stage conclude that such a claim is precluded by the limitation of remedy provision. A claim of tortious interference does not relate to the Purchase Agreement but rather relates to the alleged actions of Defendants in their representations to Plaintiff's customer, which interfered with

22

Plaintiff's prospective economic advantage with the customer.  Thus, the limitation of remedy provision is inapplicable to the claim of tortious interference with a potential economic benefit.

**G.      Counts Seven and Eight: Breach of Contract & Breach of Implied Duty of Good Faith and Fair Dealing**

Defendants argue that Plaintiff's claims of breach of contract and breach of implied duty of good faith and fair dealing fail on several grounds: (1) as to those defendants who were not parties to the contracts, there can be no cause of action; (2) the express terms of the Purchase Agreement negates any allegations of breach; (3) Section 8.1 of the Purchase Agreement, setting forth an eighteen-month survival clause to the representations and warranties contained in the Purchase Agreement, bars the claims; and (4) the limitation of remedy provision in the Purchase Agreement bars the claims. Plaintiff asserts that the corporate defendants are proper liable parties to the claims due to the alter ego theory, and that the Purchase Agreement provisions do not bar these claims.

First, only parties to the contract are generally bound by the terms of the contract. As discussed earlier, Plaintiff's alter ego theory of liability for those non-signatory Defendants fails as there are no alleged facts sufficient to find that those Defendants were alter egos of FCHI.  Therefore, the Court finds that Counts Seven and Eight must be dismissed for failure to state a claim for all Defendants except FCHI.

Second, the Purchase Agreement lays forth a number of representations and warranties made by the Seller, including certain representations regarding sales in Schedule 2.4(c).[13]  In viewing the facts most favorably for Plaintiff, due diligence information, accounts receivable information, and sales information to the extent that those representations were expressly made in the Purchase Agreement and are alleged to have arisen from claims of fraud may be construed as being exempt from the limitation of remedy provision and are thereby not waived under Section 8.7.  Additionally, covenants requiring performance after closing are exempted under Section 8.7.

Third, the time limitation set forth in Section 8.1 of the Purchase Agreement is arguably inapplicable.  This section states: "The representations and warranties contained in this Agreement . . . shall survive the Closing solely for purposes of this Article 8 and shall terminate at the close of business on the 18th month anniversary of the Closing Date."  It is unclear whether misrepresentations made in the Purchase Agreement or

---

[13]  Whether or not Schedule 2.4(c) can be viewed as a full versus limited representation of sales is unclear from the language of the contract.  Further factual inquiry into the intent of the parties may be helpful in discerning the scope of the disclosure.

fraudulent conduct which occurred before the termination date are barred under this provision.  Under the procedural posture before this Court and in viewing the facts most favorably for Plaintiff, the Court will not dismiss the claims for failure to timely bring forth a claim when the breaches of the contract and implied duties of good faith and dealing occurred within the time provision of Section 8.1.

Defendants also argue that Plaintiff has failed to sufficiently plead the elements of the breach of contract and breach of implied duty of good faith and fair dealing claims.  The Court agrees.  Plaintiff's merely conclusory allegations that there were breaches of provisions of the Purchase Agreement or the implied duty of good faith and fair dealing and without identifying the duties, and referencing which defendants, if any, breached those duties and how they breached these duties are insufficient to state a claim.  Plaintiff may within fifteen (15) days of this Letter Opinion and Order narrowly amend the Complaint, consistent with this Letter Opinion, to cure the failed pleading.

**H.    Count Four: Common Law Conspiracy**

The tort of civil conspiracy requires: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003)(citations omitted).  Defendants argue that Plaintiff has failed to state a claim of civil conspiracy because: (1) the Complaint does not allege facts sufficient to infer that the corporate defendants and Defendant Hinchen reached an agreement; (2) Plaintiff has failed to state a viable underlying cause of action; and (3) this claim is barred by the express language of the Purchase Agreement.  (Defs.' Br. 32-33.) The Court disagrees in part.  Although Plaintiff has failed to plead facts sufficient to infer that Defendants reached an agreement, Plaintiff has several potential viable causes of action in this case.  And, as these causes of action sound in fraud, the Purchase Agreement's limitation of remedies provision is inapplicable.  Plaintiff may within fifteen (15) days of this Letter Opinion and Order narrowly amend the Complaint, consistent with this Letter Opinion, to cure the failed pleading.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Second Amended Complaint is granted in part and denied in part.  An appropriate order follows.

s/William J. Martini

William J. Martini, U.S.D.J.

24