UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ   07101-0419
(973) 645-6340

WILLIAM J. MARTINI
    JUDGE

## LETTER OPINION

November 25, 2009

Kevin M. Kilcommons
Kilcommons & Shanahan, LLC
1322 Route 31 North
Annadale, NJ 08801
    *Attorneys for Plaintiff*

William D. Wallach
Richard Hernandez
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
    *Attorneys for Defendants*

    Re:   *Pathfinder Management, Inc. v. Mayne Pharma, Inc., Faulding Consumer
          Holdings, Inc., Stuart Hinchen, et al.*
          Civil Action No. 06-2204 (WJM)

Dear Litigants:

   This matter comes before the Court on Defendants' Motion to Dismiss the Third

1

Amended Complaint ("TAC"), pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  In accordance with Fed. R. Civ. P. 78, there was no oral argument.  For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED** with prejudice with respect to Count One.  The Court declines to exercise supplemental jurisdiction over the four remaining state law claims.  *See* 28 U.S.C. § 1367(a); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

## I.      BACKGROUND

This action arises out of a securities transaction entered into by Plaintiff Pathfinder Management, Inc. ("Pathfinder") and Defendants Mayne Pharma, Inc. ("Mayne Pharma"), Faulding Consumer Holdings, Inc. ("FCHI"), and Stuart Hinchen ("Hinchen"), the CEO of both Mayne Pharma and FCHI.[1]  Pathfinder entered into a Purchase Agreement in 2003 (the "Agreement") to acquire the stock and assets of two FCHI subsidiaries, Faulding Consumer, Inc. ("FCI") and Faulding Healthcare (IP) Holdings ("FHIH") (collectively, the "Acquired Companies" or the "Subsidiaries").  (TAC ¶ 13).  The effective date of the transaction was January 1, 2003, but the official closing date was not until April 3, 2003.  (*Id.* ¶ 14).  After the acquisition, the Acquired Companies were consolidated and became a single entity by the name of Radiant Technologies, Inc. ("Radiant").  (*Id.* ¶ 28).

Plaintiff alleges that shortly after acquiring the Subsidiaries, it began to observe indications that fraud that had been perpetrated by Defendants.  (*Id.* ¶ 24).  Specifically, Plaintiff says it began to experience customer returns that far exceeded the representations made by Defendants' agents.  (*Id.*)  Additionally, it learned of over $3 million in returns that had taken place in between the effective date of the transaction and the closing date that had not been disclosed.  (*Id.* ¶ 25).  Further, Plaintiff alleges that it learned of falsified accounting data and general misrepresentations about the financial health of the Acquired Companies, concealing the fact that they were virtually worthless.  (*Id.* ¶ 28).

Pathfinder's claims against Defendants can be divided into four general categories: (1) financial misrepresentations made by Defendants' agents during a January 2003 due diligence meeting, (2) misrepresentations made by Defendants' agents during a warehouse tour in January 2003, (3) misrepresentations made during two March 2003 telephone conferences between Plaintiff, Defendant Hinchen, and others, and (4) overall misleading and fraudulent accounting practices.

---

[1] Mayne Pharma Pty, Symbion Health, Ltd. (f/k/a Mayne Group Ltd.), Symbion Pharmacy Service Pty, Ltd., Faulding Health -Care International Holdings, Inc., and Faulding Healthcare US Holdings, Inc. were formerly also named as defendants in this matter but were dismissed as parties to the litigation after the Second Amended Complaint.

**A.     Sales Representations During the January 2003 Due Diligence Meeting**

On January 20-21, 2003, Pathfinder personnel attended a document inspection and due diligence meeting in Fort Lauderdale, FL.  (*Id.* ¶ 15).  During the course of a presentation to Plaintiff, the TAC alleges that Andrew Vidler ("Vidler"), FCI's vice president, and John Winning ("Winning"), FCI's national sales manager, made the following representations: (1) 2002 gross sales were approximately $8 million and 2002 net sales were approximately $4 million; (2) as of January 2003, all material returns had been accounted for among the major customer accounts; (3) strong sales were projected for 2003; (4) the CVS corporation was a major account with strong projected sales for 2003; (5) Shoppers Drug Mart, a major Canadian account, was a non-return business such that there was no risk of returns in Canada; and (6) Associated National Brokerage, an exclusive Canadian distributor, had an outstanding balance from 2002 and therefore had no right to any credits from products returned by customers prior to December 1, 2002.  (*Id.* ¶ 16).

The TAC also states that at this same meeting, FCHI provided Plaintiff with a fact sheet dated December 2002 which reported the following financial performances: (1) for financial year ("FY") 2000/2001, gross sales of $4.3 million, gross profit of $2.3 million, and earnings before interest and taxes ("EBIT") of negative $1.12 million, (2) for FY 2001/2002, gross sales of $8.5 million, gross profit of $4.0 million, and EBIT of negative $858,000; and (3) for FY 2002/ 2003, forecasted gross sales of $11.8 million, gross profit of $7.1 million, and EBIT of positive $1.5 million.  (*Id.* ¶ 17).  The TAC states that Defendant FCHI "provided" Plaintiff's representatives with the fact sheet but does not specifically state which individual actually handed it over or prepared it.  (*Id.*).  The TAC also does not state which of Defendant's agents were present at the meeting.  Furthermore, the TAC states that in the fact sheet, Defendant actually refers to itself as Mayne or Mayne Group and not as FCHI.  (*Id.*).

Finally, the TAC alleges that credits and returns were discussed at the meeting and that "Plaintiff's representatives were told that all returns were in."  (*Id.* ¶ 15).  The TAC does not say who specifically made this assertion.

The TAC goes on to allege that all of these assertions were false.  Business records allegedly maintained by FCI controller Frank Scanlan ("Scanlan) during the relevant time periods revealed the following financial information: for FY 2002/2003, gross sales of $9.4 million, gross profit of $2.5 million, and EBIT of $13.5.  (*Id.* ¶ 35).  However, these records also allegedly showed a cancellation of debt that reduced the actual EBIT to negative $9.7 million, which was far below the $1.5 million represented by Hinchen,

Vidler, or Winning. (*Id.*). The TAC alleges that Defendant and its representatives "certainly knew" that the EBITs were incorrect when represented because of an email containing this information that was written by Vidler and sent to Scanlan, and because Scanlan reported to Hinchen and Vidler. (*Id.* ¶ 36). The TAC also asserts that Defendants "would have been aware" of the information being reported to the IRS. (*Id.* ¶ 37).

### B.      Representations Regarding Warehouse Inventory

On January 21, 2003, Plaintiff conducted a tour of warehouse facilities in Pompano Beach, FL. (*Id.* ¶ 18). Present on the tour were Hinchen, Winning, Vidler, Erin Zaccaro ("Zaccaro") of Defendant Mayne Pharma, FCI warehouse manager Mitch Saltzman ("Saltzman"), and various Pathfinder personnel. (*Id.*). Plaintiff alleges that its representatives were shown racks of the Acquired Companies' inventory. According to the TAC, "the issue of the product containing the old Asta-Zanthin staining formula was discussed, and Defendants' representatives specifically told Pathfinder that the inventory shown did not represent any of the defective Asta-Zanthin product." (*Id.*).[2] The TAC does not allege who specifically made this representation.

Plaintiff further alleges that the representation made concerning the lack of Asta-Zanthin product in the inventory was false. After the transaction closed, the TAC says Saltzman told Plaintiff that he overheard a conversation between Vidler and Winning in which they discussed hiding the defective Asta-Zanthin product off site but instead decided to place it in the warehouse on the highest shelves, in hopes that prospective buyers would not look there. (*Id.* ¶ 46.b). Plaintiff further alleges that "Hinchen, Vidler, and/ or Winning" threatened to fire Saltzman if Saltzman told anyone from Pathfinder about the presence of the defective product. (*Id.*).

### C.      Representations During March 2003 Telephone Conference Calls

Plaintiff alleges that although a purchase price of $3,500,000 was initially agreed upon, it ultimately agreed to pay an additional $1.1 million based upon representations made by Defendants. (*Id. ¶¶* 21-23). Specifically, Plaintiff alleges that it was told by Defendants of significant positive accounts receivable (money due to come in from customers) that would more than offset any negative accounts receivable (credits in favor of retailers) and that Defendants requested more money for the sale. (*Id.*). A telephone

---

[2] Although the SAC explains that Asta-Zanthin was a tanning lotion that inadvertently stained customers' clothes and was subject to recall, this information was left out of the TAC, leaving the Court to infer that this is what is referred to by the "defective Asta-Zanthin product."

4

conference was held on March 4, 2003, between Defendant Hinchen, who was located in New Jersey, and Pathfinder representatives located in California.  (*Id.*).  During this call, Pathfinder's representatives stated that this demand would be acceptable only if the $1,000,000 in positive accounts receivable was "new money" that had not previously been factored into the purchase price.  (*Id.*).  According to the TAC, "Hinchen did not dispute the accuracy" of this position.  (*Id.*).

On March 5, 2003, there was a second telephone conference, between Winning and Pathfinder personnel, concerning the accounts receivable.  (*Id.* ¶ 22).  Based on the total of these representations, Pathfinder agreed to pay an additional $1.1 million for the assumption of the positive accounts receivable listed on Schedule 2.4(c) of the Agreement.  (*Id.* ¶ 23).  However, Pathfinder alleges that it learned during a subsequent audit that the dollar amounts listed on Schedule 2.4(c) were vastly overstated.  (*Id.* ¶ 33).

### D.     Fraudulent Accounting Practices

The TAC alleges that Defendants adopted "odd accounting practices" to conceal and disguise poor sales and high returns.  (*Id.* ¶ 28).  Pathfinder alleges that the individual officers and employees of FCHI, Mayne Pharma, and the Acquired Companies directly responsible for withholding sales and accounting information were Hinchen, Vidler, Winning, and Scanlan.  (*Id.* ¶ 26).  Scanlan, who was FCI's controller, was hired to be Radiant's controller after the acquisition.  (*Id.* ¶ 28).  He was terminated in December 2004 due to unusual accounting practices that he refused to correct.  (*Id.*).  After his termination, Pathfinder's Vice President Catherine Becker ("Becker") realized that Scanlan had "never formally closed-out any month during fiscal years 2003 or 2004, pursuant to generally accepted accounting practices" and that therefore "no traceable sales data was stored or saved" in the industry standard accounting system.  (*Id.*).  As a result, Pathfinder alleges that Scanlan had the ability to go back and alter numbers without detection by Pathfinder or Radiant.  (*Id.*).

The TAC alleges that an anonymous former employee who reported to Winning knew that fraudulent accounting practices were being followed.  (*Id.* ¶ 32).  The TAC says that Scanlan told the employee to create false invoices to reflect higher sales numbers at month's end and then "was given the directive to adjust the same accounts mid- month with offsetting credits.  (*Id.*).  The TAC does not say who told the employee to go back and adjust the accounts.   The TAC alleges that theses directives were coming down a chain of command from Vidler to Winning to Scanlan on down to the support staff.  (*Id.*).  When the employee asked Scanlan questions about invoicing, Scanlan allegedly said "I'm only the messenger."  (*Id*.)

5

### E.        Complaint and Procedure

Pathfinder filed an initial complaint on May 9, 2004.  An amended complaint was filed in July 2006, and a second amended complaint ("SAC") was filed on February 2, 2007.  Defendants filed a motion to dismiss the SAC.  This motion was granted in part and denied in part.  Several claims and numerous defendants were dismissed.  With respect to the securities fraud claim, the Court recognized that Plaintiff had adequately pled the material misstatement and scienter components of a 10-b 5 claim with respect to certain allegations but not all.

Plaintiff filed a third amended complaint in August 2008.  The TAC contains five counts, one federal securities claim and four state law claims relating to fraudulent misrepresentation, negligent misrepresentation, breach of contract, and breach of implied duty of good faith and fair dealing.  The TAC does not contain significant changes as compared to the SAC.

Defendants have moved for dismissal of the TAC pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## II.       ANALYSIS

### A.       Standard of Review

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).  When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may take into account only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents.  *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir 1993).  If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears that no relief could be granted "under any set of facts that could be proved consistent with the allegations," a court may dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Although a complaint does not need to contain detailed factual allegations, "the 'grounds' of [the plaintiff's] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).  Thus,

the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level.  *See id*. at 1964-65.  Furthermore, although a court must view the allegations as true in a motion to dismiss, it is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F. 3d 187, 211 (3d Cir. 2007).

## B.      Count One: Federal Securities Fraud Claim

In Count One of the TAC, Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j.(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Specifically, Plaintiff alleges that Defendants made misstatements or omissions of material fact, with knowledge or recklessness, in connection with the purchase or sale of a security, upon which Plaintiff reasonably relied and which was the proximate cause of its injury.  Defendants argue that the securities fraud claim fails because Plaintiff has failed to sufficiently allege two key elements, material misstatements and scienter.  The Court will address each argument in turn.

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit "the use of any means or instrumentality of interstate commerce" in conjunction with the commission of fraud.  15 U.S.C. § 78j.(b); 17 C.F.R. § 240.10b-5.  To state a claim for fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must demonstrate that a defendant: (1) made a misstatement or omission of a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, and (5) that plaintiff's reliance proximately caused injury.  *McCabe v. Ernst & Young, LLP*, 494 F. 3d 418, 424 (3d Cir. 2007); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004).  These elements must be pled with particularity, in accordance with the heightened pleading requirements of Fed. R. Civ. P. 9(b) for averments of fraud.  Fed. R. Civ. P. 9(b); *GSC Partners CDO Fund*, 368 F.3d at 236. In addition, the Private Securities Litigation Reform Act ("PSLRA") requires that a plaintiff specify each statement alleged to have been misleading, state why it was misleading, and, for allegations made upon information and belief, state in detail all facts upon which that belief is based.  15 U.S.C. § 78u-4(b)(1).  If a complaint fails to comply with the requirements of the PSLRA, dismissal is mandatory.  *GSC Partners CDO Fund*, 368 F.3d at 237.

### 1.      Material Misstatements

Defendants' first argument in support of dismissing the securities fraud claim is that Plaintiff fails to allege actionable misstatements or omissions.  Defendants state that the TAC fails to plead facts with sufficient particularity and that "many of the statements

which Plaintiff alleges are false and misleading" are forward- looking statements that fall within the PLSRA's safe harbor provisions.   (Dfdt.'s Br. at 6).   Plaintiff refutes this and reiterates the alleged material misstatements or omissions set forth in the TAC: (1) the representations made at the January 2003 presentation that 2002 gross sales were $8 million and net sales were $4 million, when in fact net 2002 net sales were less than $1 million;[3] (2) the representation made during the January 2003 warehouse tour that the inventory did not contain any of the defective Asta-Zanthin product; (3) the representations made at the January 2003 presentation regarding "strong" 2003 projected sales; (4) the representations made orally during the January 2003 due diligence presentation, stated on the fact sheet and P&L statement handed out at that presentation, and the March 2003 telephone conference calls, with respect to projected 2003 sales and accounts receivable;[4] and (5) the oral statements concerning receivables listed in Schedule 2.4(c) of the Purchase Agreement.   (Pl.'s Opp. Br. at 7-8).

In its prior opinion of August 2008, this Court found that all five of these categories of alleged material misstatements were sufficiently pled with respect to the requirements of both Fed. R. Civ. P. 9(b) and the PSLRA.   Although the SAC contained two additional alleged material misstatements that the Court found were not sufficiently pled, pertaining to market share and the reformulation of the Asta-Zanthin product, they were not included in the TAC and do not require further discussion here.   Therefore, the Court concludes that the five alleged sets of material misstatements contained within the TAC and repeated in Plaintiff's Opposition brief are sufficiently pled on their faces.

However, in the Motion to Dismiss the TAC, Defendant raises a new argument that while Plaintiff's allegations may be sufficiently pled on their faces, they are in fact covered by the safe harbor provision of the PSLRA for forward- looking statements such that they are not actionable.   (Dfdt's Br. at 6-8).   The Court will now consider this position.

The PSLRA provides a safe harbor for forward- looking statements made under certain circumstances.   15 U.S.C. § 78u-5(c); *see also GSC Partners CDO Fund*, 368 F.3d at 242.   Specifically, the PSLRA provides that there is no liability for forward- looking

---

[3]   Note that Plaintiff's Opposition Brief states that in the TAC, Defendants misrepresented 2002 gross sales as $18 (eighteen) million.   In actuality, the TAC stated $8 (eight) million.   Because this is the only place where Plaintiff alleges that 2002 gross sales were misrepresented as $18 million, the Court will assume this was a typographical error and that Plaintiff intended to write $8 million.

[4]   Although category 4 has significant overlap with the alleged misstatements in categories 1 and 3, Plaintiff has listed them separately, so for the purposes of clarity and consistency, the Court will do the same.

8

statements that are "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). Even if there is no such cautionary language, liability does not attach if the plaintiff "fails to prove that the forward- looking statement… was made with actual knowledge… that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i). The requirements surrounding liability for a forward- looking oral statement are similar. 15 U.S.C. § 78u-5(c)(2).

The PLSRA defines a forward- looking statement as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u-5(i). Thus, projections with respect to future earnings as well as the collectability of client accounts are typically deemed forward- looking statements. See *EP Medsystems, Inc. v. Echocath, Inc*., 235 F.3d 865, 878 (stating that "[o]rdinarily, sales projections… are characterized as forward-looking statements" for the purposes of the PSLRA safe harbor); *see also GSC Partners CDO Fund,* 368 F.3d at 242 (finding that a statement about collectability is a "prediction of the likelihood of collection" and is a classic example of a forward-looking statement).

Here, Defendant's statements with respect to strong projected earnings for 2003 (made during the January 2003 presentation) and the collectability of certain accounts (made during the March 5, 2003 conference calls) clearly qualify as forward- looking. Indeed, Plaintiff does not dispute that certain of Defendants' statements may have been forward- looking. The only argument that Plaintiff does make regarding the applicability of the safe harbor is that Defendants' forward-looking statements are not accompanied by any cautionary language. Although this may be true, it is irrelevant. The plain language of the PSLRA demonstrates that even in the absence of a cautionary statement, there is no liability for a forward-looking statement unless the plaintiff can prove that the defendant making the statement knew it was false at the time it was made. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i). As noted in Defendants' brief, neither the TAC nor Plaintiff's opposition makes any showing that Defendants knowingly made false statements.[5]

---

[5]  Indeed, the TAC does not even appear to allege that these misstatements were made by defendants in the case, let alone by defendants who knew they were false or misleading. The parties alleged to have made the material misstatements at the January 2003 presentation are Vidler and Winning. However, neither Vidler nor Winning are defendants, or agents of defendants, in this action. They were employed by the Acquired Companies, not by Defendants. The TAC fails to provide any reason why their actions should be attributable to Defendants. Although Defendant Hinchen was a participant in one of the conference calls, the TAC does not show that he knew any of the information was false.

9

Therefore, Defendants' statements regarding 2003 projected sales and earnings and the collectability of certain accounts are not actionable under 10b-5. Because the Schedule 2.4(c) representations were based upon the collect ability of certain accounts, they too are covered by the safe harbor. None of Defendants' other alleged material misstatements can be characterized as forward- looking.

Thus, the Court finds that the following alleged material misstatements are sufficiently pled with respect to both Fed. R. Civ. P. 9(b) and the PSLRA and are actionable pursuant to 10b-5: (1) the representations regarding 2002 gross and net sales; (2) the representations regarding the defective Asta-Zanthin product in the warehouse; and (3) the representations made orally during the January 20-21 2003 due diligence presentation, contained in the fact sheet handed out at that presentation, and made during the March 2003 telephone conference calls, that pertained to past earnings, specific amounts owed (but not the collectability of those accounts), and whether certain clients were permitted to return products (but not how many returns were anticipated).[6] Any alleged misstatements regarding 2003 projections or accounts receivable are not actionable.

### 2.   Scienter

Defendants also argue that the securities fraud claim fails because Plaintiff does not adequately plead scienter. Defendants state that "Plaintiff has not alleged in the TAC any specific actions or knowledge by any of the Defendants or anyone else through whom scienter, legally or factually, could be imputed to the Defendants. Nor… has the TAC alleged how and in what manner each [D]efendant knew the falsity of any given statement." (Dfdt.'s Br. at 9). Plaintiff does not refute this convincingly.

---

[6] While these actions qualify as material misstatements or omissions, the Court again notes that Plaintiff does not appear to allege that most, if any, of them were made by defendants in this action, which is also a requirement of the statute. As stated above, the representations at the January 2003 presentation were made by Vidler and Winning. The representations about the Asta-Zanthin product were also made by Vidler and Winning. Again, Vidler and Winning are not defendants in this action, nor are they employed by Defendants. While Plaintiff makes a cursory allegation that the fact sheet was provided by Defendant FCHI, Plaintiff admits in the same sentence that in the document, Defendant refers to itself not as FCHI or as any other defendant, but as Mayne or Mayne Group, who are not defendants. Finally, Plaintiff's allegations contain no information at all concerning who prepared Schedule 2.4(c) or gave it to Plaintiff. Although the TAC does say that the P&L information was distributed by Defendant Hinchen, the alleged misrepresentation contained within it concerned projected 2003 earnings and is not actionable. Because Defendant does not raise this issue with respect to material misstatements but only with respect to scienter, it will be addressed in the portion of this opinion dedicated to scienter.

Scienter is a mental state embracing an intent to deceive, manipulate, or defraud and is a necessary component of a securities fraud action. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 318 (2007). The PSLRA requires that a complaint state with particularity facts giving rise to a strong inference that the defendant acted with the requisite intent with respect to each act or omission. 15 U.S.C. § 78u-4(b)(2); Fed. R. Civ. P. 9(b). This supersedes the usual procedural rule that state of mind can be averred generally. *See In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1328 (3d Cir. 2002). Determining whether a strong inference of scienter exists requires a court to consider competing inferences. An inference is only considered strong if it can be deemed cogent and compelling. *Tellabs, Inc.,* 551 U.S. at 323. Finally, the PSLRA prohibits group pleading of scienter, so the plaintiff must specify scienter with respect to each defendant. *Winer Family Trust v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007).

Scienter can be alleged in one of two ways: (1) by alleging facts to show that the defendant possessed both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. 15 U.S.C. § 78u-4(b)(2); *GSC Partners CDO Fund*, 368 F.3d at 237. Defendants argue that Plaintiff fails to demonstrate either motive and opportunity or circumstantial evidence. (Dfdt's Br. at 10). The Court agrees. Both arguments are addressed.

### *a. Motive and Opportunity*

To plead scienter by alleging motive and opportunity, the allegations must be supported by facts stated with particularity and must give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2); *In re Advanta Corp. Sec. Litig*., 180 F.3d 525, 535 (3d Cir. 1999). Blanket assertions of motive and opportunity are insufficient, as are motives that are generally possessed by most corporate officers and directors. *GSC Partners CDO Fund*, 368 F.3d at 237. Rather, a plaintiff must assert concrete and personal benefit to individual defendants resulting from the fraud. *Id.* at 237-238.

Here, as Defendants observe, Plaintiff claims that Defendants had the motive and opportunity to commit fraud in order to "avoid the costs" that would have accompanied shutting down the Acquired Companies rather than selling them, "to protect the Mayne parent" from having to infuse further money into the Acquired Companies, and to eliminate the Acquired Companies' losses. (TAC at ¶¶ 41-43). However, these motives relate to a desire to maximize profit and minimize losses. They are motives that any corporation or officer would share and do not reference any specific and personal benefit that accrued to Defendants or their agents. Therefore, they are insufficient to support a strong inference of scienter under the stringent requirements of the PSLRA.

Plaintiff's opposition brief does not refute the argument that the TAC is devoid of allegations of motive and opportunity giving rise to a strong inference of scienter. Therefore, as this Court concluded in 2008 with respect to the SAC, the TAC's allegations of scienter are not supported by evidence of motive and opportunity.

                b.     *Circumstantial Evidence*

Scienter can also be established by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *GSC Partners CDO Fund*, 368 F.3d at 237; *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (finding that "where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial evidence must be correspondingly greater"). Such allegations must go beyond mere statements that "defendants knew their statements were fraudulent" or that "defendants must have known their statements were false." 15 U.S.C. § 78u-4(b)(2); *GSC Partners CDO Fund*, 368 F.3d at 239; *In re Milestone Scientific Sec. Litigation*, 103 F.Supp. 2d 425, 470 (D.N.J. 2000). The fraudulent intent of each defendant must be alleged separately as group pleading is not allowed. *Winer Family Trust*, 503 F.3d at 335. Furthermore, the complaint must allege that the defendant benefited in a concrete and personal way from the purported fraud. *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F.Supp. 2d 574, 581 (D.N.J. 2005).

In the 2008 opinion, the Court found that only two sets of allegations contained in the SAC were amply supported by circumstantial evidence to implicate scienter. These were the allegations regarding the presence of Asta-Zanthin product in the warehouse, as related by warehouse manager Mitch Saltzman, and regarding the inflation or false adjustment of sales figures, as reported by the anonymous employee. These remain the only two sets of allegations amply supported by circumstantial evidence to give rise to a strong inference of scienter in the TAC as well. However, as Defendants observe, although they give rise to scienter, it is not scienter that can be attributed to Defendants.

The TAC alleges that on January 21, 2003, Pathfinder personnel, accompanied by Hinchen, Winning, Vidler, Zaccaro, and Saltzman, inspected warehouse facilities and inventory in Pompano Beach, FL. (TAC ¶ 18). The TAC states that "Defendants' representatives specifically told Pathfinder that the inventory shown did not represent any of the defective Asta-Zanthin product." (*Id*.) Later on, Saltzman reported to Pathfinder that he had overheard a discussion between Vidler and Winning indicating that this was not true. (*Id.* at 46.b). According to Saltzman, Vidler and Winning had discussed hiding the defective Asta-Zanthin product off-site but ultimately decided to place it on high shelves in

the warehouse where it might not be seen.  Saltzman also stated that "Hinchen, Vidler, and/ or Winning threatened to fire him" if he told anyone from Pathfinder that there was Asta-Zanthin in the warehouse.  *(Id.)*

While these allegations appear to show that there was Asta-Zanthin in the warehouse and that Vidler and Winning knew about it, they fail to implicate scienter with respect to Defendants or any agents of Defendants.  Scienter cannot be imputed to a defendant unless that defendant, or a party whose intent can be imputed to that defendant, possessed the requisite state of mind.  When the defendant is a corporation, incapable of forming intent directly, "a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the acts and accompanying mental state are attributable to the corporation."  *Teamsters Div. Pension Fund*, 531 F.3d at 195; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc*, 513 F.3d 702 (7th Cir. 2008).  Furthermore, the knowledge and actions of a subsidiary company's agents cannot be imputed to the parent company.  *Israeli v. Team Telecom Int'l, Ltd*., 2006 WL 2883237 at *24 (D.N.J.).

The participants in the conversation about Asta-Zanthin overheard by Saltzman were Winning and Vidler, neither of whom are defendants in this action nor employees or agents of any defendants.  Vidler was the vice-president of FCI and Winning was a national sales manager for FCI.  Neither one is alleged in the TAC to be an officer, director, or agent of either FCHI or Mayne Pharma and as such, their actions and intentions cannot be imputed to FCHI or to Mayne Pharma.  This remains unaltered by the fact that FCHI was the parent company and controlling shareholder of the Acquired Companies and Mayne Pharma was the parent company of FCHI.  *See Israeli v. Team Telecom Int'l, Ltd*., 2006 U.S. Dist. LEXIS 73552 at *8 (D.N.J.). And while Hinchen is a defendant in this matter, the TAC alleges only that "Hinchen, Vidler, **and/or** Winning" (emphasis added) threatened to fire Saltzman.  Although Plaintiff argues that this statement "unquestionably establishes Hinchen's scienter," in fact it does not even establish his involvement.  This is far too tenuous a link to impute scienter to Hinchen.

The 2008 opinion noted that group pleading of scienter is insufficient and that with respect to these allegations, Plaintiff failed to properly allege "which, if any, Defendants Vidler… [and] Winning… were purporting to represent as an agent" such that the Court could not determine which, if any, Defendants could be held liable.  Plaintiff has not rectified this in the TAC.

This same reasoning applies to the allegations resulting from the testimony of the anonymous employee.  While the anonymous employee claims to have been aware of the falsification of invoices, she says only that the directives came from Winning and Vidler, and that Scanlan knew about them but claimed to be "only the messenger."  As noted

13

above, Winning and Vidler's actions and intent cannot be imputed to FCHI or Mayne Pharma.  Additionally, even if Scanlan knew that the directives he was passing on pertained to falsification of records, which is not clear, his state of mind also cannot be imputed to Defendants.  Scanlan was the controller of FCI, not of FCHI or Mayne Pharma, and thus his intent cannot be imputed to FCHI or Mayne Pharma.  And without more evidence, it cannot be imputed to Hinchen either.  Although Hinchen was Scanlan's superior, this is insufficient to impute scienter.  *See Israeli*, 2006 WL 2883237 at *5 ("generalized imputations of knowledge do not suffice to establish scienter, regardless of the defendant's position with the corporation").

       The TAC also states that "Defendants would have been aware of" adverse tax information.  (TAC ¶ 37).  This type of generalized allegation blatantly falls short of the specificity required by the PSLRA.  Likewise, it is insufficient to argue that because various parties including Hinchen may have received a memo about losses, that Hinchen knew of its contents and that the resulting earnings numbers were inaccurate.  (Pl.'s Opp. Br. at 9).  These types of statements do not rise to the level of particularity necessitated by the stringent standards of the PSLRA.

       The Court finds that the TAC is entirely devoid of allegations giving rise to a strong inference of scienter that are attributable to Defendants.  Because scienter is a necessary component of a securities fraud claim, Plaintiff's claim cannot survive the motion to dismiss.

**C.**    **Counts Two, Four, Six, And Seven: State Law Fraudulent Misrepresentation, Negligent Misrepresentation, Breach of Contract, and Breach of Implied Duty of Good Faith and Fair Dealing Claims**

       The Court declines to exercise supplemental jurisdiction over the four remaining state law claims.  *See* 28 U.S.C. § 1367(a); *United Mine Workers*, 383 U.S. at 726 (1966) (a federal court's power to exercise supplemental jurisdiction over state law claims "need not be exercised in every case in which it is found to exist").[7]

**III.**    **CONCLUSION**

       The Court has engaged in a detailed analysis of each and every alleged

---

[7] The Court is cognizant that this action was first filed in federal court in 2006.  Nevertheless, this should not affect Plaintiff's ability to refile its remaining claims in state court should it so choose. "The period of limitations for any claim asserted under" 28 U.S.C. § 1367(a) "shall be tolled while the claim is pending" in federal court and for 30 days after it is dismissed, unless state law provides for a longer tolling period.  28 U.S.C. § 1367(d).

14

misrepresentation raised by Plaintiff.   However, regardless of whether these alleged misrepresentations were sufficiently pled or fell within the PSLRA's safe harbor provision, the TAC plainly fails to provide sufficient evidence to attribute them to named defendants in this case.   For this reason and for the additional reasons set forth above, Defendants' Motion to Dismiss Count One of the TAC is **GRANTED** and Count One is **DISMISSED** with prejudice.   The Court declines to exercise supplemental jurisdiction over the four remaining state law claims.   *See* 28 U.S.C. § 1367(a); *United Mine Workers*, 383 U.S. at 726.   An appropriate order follows.

     /s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**